UNITED STATES of America,
Plaintiff-Appellee,

v.

Margarito O. ROMERO,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Hugo Frederic FORSTER,
Defendant-Appellant.

Nos. 77–2964, 77–2969.

United States Court of Appeals,
Ninth Circuit.

Aug. 16, 1978.

Rehearing and Rehearing En Banc
Denied Nov. 3, 1978.

---

Ephraim Margolin (argued), San Francisco, Cal., William L. Osterhoudt (argued), of Singer & Osterhoudt, San Francisco, Cal., for defendants-appellants.

Edward P. Davis, Asst. U. S. Atty. (argued), San Francisco, Cal., for plaintiff-appellee.

Before MERRILL, Senior Circuit Judge, SNEED, Circuit Judge, and EAST,* Senior District Judge.

* Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation.

EAST, Senior District Judge:

**THE APPEALS:**

Appellant Margarito O. Romero appeals his judgment of conviction and sentence to custody on eight counts of violating 18 U.S.C. § 2314 (stolen gold transported in interstate commerce) and one count of violating 18 U.S.C. § 371 (conspiracy).

Appellant Hugo Frederic Forster appeals his judgment of conviction and sentence to custody on five counts of violating § 2314 and one count of violating § 371.

The appeals were consolidated for hearing and disposition.

We note jurisdiction and affirm.

**PROCEEDINGS IN THE DISTRICT COURT:**

Romero and Forster were jointly indicted on October 13, 1976. The charges under §§ 2314 and 371 covered the period of November, 1973 through March, 1975. The District Court denied the several motions of Romero and Forster for the suppression of documentary evidence seized under federal search warrants from the possession of state law enforcement officers. The District Court also denied appellants' motions for dismissal on the grounds of speedy trial violations and abuse of the grand jury process. Romero and Forster were tried to the District Court without a jury upon a stipulation of facts and the admission in evidence of the various federally seized documents under illegal seizure challenge. The judgments of conviction and sentences to custody were duly entered. Romero and Forster are each at liberty pending appeals.

**FACTS:**

During 1973, the United States Secret Service uncovered information that R & F Metals (R & F), Romero and Forster's metal processing business, was shipping gold, believed to have been stolen from a mine in Nevada, to Chicago, Illinois. This information was subsequently provided to the South San Francisco Police Department which had been conducting its own investigation into R & F's gold business triggered by information from a local refinery.

In March, 1975, Detective Singleton of the South San Francisco Police Department contacted the Federal Bureau of Investigation (FBI), which then began its own investigation of R & F's gold trafficking. The FBI investigation was extensively pursued both on an independent basis and in conjunction with state law enforcement authorities.

The South San Francisco Police Department executed state search warrants upon the premises of Romero and Forster on May 2 and June 17, 1975, respectively, and seized all documents and records pertaining to the manner in which they conducted their businesses. During August and September, 1975, hearings were held in the state court resulting in the prosecutor's agreement to return all items not deemed by him to be relevant to the prosecution. This return was not fully accomplished until early 1976 after contempt proceedings had been instituted by Romero and Forster. Meanwhile, however, the police had segregated the documents deemed to be relevant and moved them from the police garage to Detective Singleton's office. Later, when approximately 70 to 80 percent of the documents had been returned to Romero and Forster, most of those documents retained were transferred from the police department to the prosecutor's office for use in the state prosecution.

In August, 1975 and before Romero and Forster had filed their state court motions to suppress the evidence,[1] the records, at that time still in the police garage, were made available to the FBI and were examined by federal agents in connection with their independent investigation. Additionally, those documents found relevant by the police and transferred to Singleton's office were later re-examined.

---

1. Romero and Forster imply that the FBI was aware that the documents they examined in August of 1975 had been illegally seized. This allegation is incorrect; it was not until late August and September, 1975, that Romero and Forster requested the return of certain documents during *preliminary* state court motions.

On October 22, 1975, Romero and Forster were indicted in the Superior Court for San Mateo County, California for a variety of state offenses.

In late March of 1976, Judge Haverty of that Court suppressed the state search warrants and seizure solely on the ground that the warrants' description of the items to be searched for and seized was too broad.[2] As a result of this ruling, the majority of the case against Romero and the entire case against Forster were dismissed.

On April 26, 1976, the FBI, under authorization of the United States Attorney's office, secured and executed three federal search warrants for Romero's home, Forster's business office, and the office of the state prosecutor.[3]

The federal warrants were supported by affidavits which contained no significant information which was not available to the FBI prior to the issuance and execution of the state warrants. Detective Singleton aided in the preparation of the federal warrants and testified that he gave the FBI only information known to him before the state seizures.

Immediately prior to the execution of the federal warrants, the Assistant United States Attorney in charge of the federal investigation met with Judge Haverty to inform him of the pending search warrants for the state prosecutor's office, Romero's home, and Forster's business. Judge Haverty expressed no objection to the procedure to be utilized by the federal government in order to obtain the records and he did not indicate that he believed seizure pursuant to the federal warrants would violate the spirit of his order suppressing the evidence. On April 28, 1976, Judge Haverty ordered the records returned to their rightful owners.

**2.** The Government conceded below that the state seizures were unlawful under federal constitutional standards.

**3.** The state prosecutor handling the case stated that if the federal government wanted the doc-

ISSUES ON REVIEW:

We deem the dispositive issues to be:

1. Did the District Court err in denying Romero's and Forster's motions to suppress the evidence seized under the federal warrants?

2. Were Romero and Forster denied the right to a speedy trial in violation of the Sixth Amendment of the United States Constitution or were they denied due process by reason of prejudicial indictment delay in violation of the Fifth Amendment of the United States Constitution?

3. Did the District Court err in failing to dismiss the cause on grounds of abuse of the grand jury?

DISCUSSION:

I. *Motion to Suppress the Fruits of the Federal Search Warrant.*

Romero and Forster contend that the evidence introduced at trial is the direct "fruit" of the unlawful state seizure and was discovered and utilized through a direct exploitation of the illegal state seizure. As such, they contend, it must be suppressed. Appellants also assert that even if the federal warrant was not tainted by the illegal state seizure, the evidence must nevertheless be suppressed in order to effectuate the policy behind the exclusionary rule; *i. e.,* the deterrence of official misconduct. *See Stone v. Powell,* 428 U.S. 465, 486, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); *United States v. Janis,* 428 U.S. 433, 458–59 n.35, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976).

In addressing the problem of whether the evidence sought to be suppressed was gathered through exploitation of an illegal search, the District Court, in a scholarly and well analyzed memorandum, applied the legal standard expressed in *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), and *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40

uments in his possession, a search warrant for his office would be required as the documents were technically not in his possession in that he had been ordered by the state court to return the records.

S.Ct. 182, 64 L.Ed. 319 (1920),[4] and concluded:

> "By now it is well established that evidence unlawfully seized does not thereby become 'immune' from use by law enforcement agencies. Rather, so long as the evidence derives from a source independent of the prior illegality, it may be admitted into evidence."

We agree with that premise. In *United States v. Ceccolini,* 435 U.S. 268, 273–274, 98 S.Ct. 1054, 1059, 55 L.Ed.2d 268 (1978), the Court stated:

> "The constitutional question under the Fourth Amendment was phrased in *Wong Sun* . . . as whether 'the connection between the lawless conduct of the police and the discovery of the challenged evidence has become "so attenuated as to dissipate the taint." ' *Id.* at 487, 491, 83 S.Ct. at 417. The question was in turn derived from the Court's earlier decision in *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 454 (1939), where Mr. Justice Frankfurter stated for the Court:

> > " 'Here, as in the *Silverthorne* case, the facts improperly obtained do not "become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it" simply because it is used derivatively. 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319.

> > " 'In practice this generalized statement may conceal concrete complexities. Sophisticated argument may prove a causal connection between information obtained through illicit wiretapping and the Government's proof. As a matter of good sense, however, such connection may have become so attenuated as to dissipate the taint.' "

On the factual issue of the illegal action taken by the state and any possible taint, the District Court found:

> "An examination of the *affidavit* attached to the *state* search warrant reveals that the facts permitting adequate specificity in the *federal* warrant were known prior to the state seizure. . .

> ". . . Similarly, by essentially restating the facts recited in the state affidavit, and thus known prior to the unlawful [state] seizure, the federal affidavit provided adequate untainted basis upon which to derive the descriptive terms employed by the federal warrant." (Emphasis in original).

The District Court concluded therefrom "that the evidence unlawfully seized by the state was not utilized in the preparation of the federal affidavit or warrant."

▉ Viewing the evidence in the light most favorable to the Government, *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), we agree with the District Court's findings that the federal warrant was based on information obtained prior to the execution of the state warrant and was untainted by the illegally seized evidence.

Romero and Forster assert that even if the evidence seized under the federal warrant is found not to be the fruit of the invalid state search, the evidence must nevertheless be suppressed.[5] They contend that the federal warrant is merely an attempt to cure a prior illegal search and that policy considerations underlying the exclusionary rule demand exclusion of the evidence to deter otherwise unreviewable police conduct.

In this vein, the District Court proceeded to evaluate the potential for unlawful searches despite an independent factual basis for the search:

---

4. Appellants' complaints concerning the District Court's asserted reliance on the "inevitable discovery rule" are unfounded. In any event, the District Court did not significantly rely upon this doctrine as a basis for its opinion.

5. Romero and Forster's contention that the FBI should have proceeded by way of a subpoena duces tecum rather than a search warrant is unfounded. *Zurcher v. Stanford Daily,* 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978).

"A certain class of cases, however, prove somewhat anomalous under this approach. This is where the authorities have sufficient information to secure a search warrant, but prior to doing so they conduct an unlawful search either to confirm their suspicions, or for some other purpose.

.        .        .        .        .

"*United States v. Griffin,* [502 F.2d 959 (6th Cir. 1974)], involved the unlawful search and seizure of a dwelling by police, while other officers secured a search warrant. Although a warrant based upon previously obtained information was issued and executed, the evidence was nevertheless suppressed. Rejecting the government's contention that the evidence unlawfully seized would have been 'inevitably discovered' pursuant to the search warrant, the court concluded that exclusion of the evidence was the only practical means of deterring unlawful police conduct.

"*Krauss v. Superior Court,* [5 Cal.3d 418 [96 Cal.Rptr. 455, 487 P.2d 1023] (1971)], reached the opposite result. There, police had probable cause to obtain a warrant but prior to doing so conducted a warrantless search to confirm their suspicions. The court concluded that the evidence was admissible as based upon sources independent of the unlawful search. 'To hold otherwise would go beyond excluding evidence unlawfully obtained and in effect grant petitioner immunity from prosecution because of the officer's collateral wrong.' 5 Cal.3d at 423 [96 Cal.Rptr. 455, 487 P.2d 1023]. Cf. *Wayne v. United States* [115 U.S.App. D.C. 234] 318 F.2d 205, 209 [(D.C. Cir.), cert. denied, 375 U.S. 860 [84 S.Ct. 125, 11 L.Ed.2d 86] (1963)]; *United States v. Bravo,* 403 F.Supp. 297 (S.D.N.Y.1975).

"In deriving the outer perimeters of the exclusionary rule, courts have been guided largely by a reasoning process which balances the deterrence value of excluding a particular class of evidence against the policies in favor of admitting all evidence relevant to the fact-finding proc-

ess. Thus the exclusionary rule, even as applied to the direct fruits of unlawful police activity, has been circumscribed in a variety of contexts in which the deterrence principle alone might logically be deemed to apply.[3] Analogously, the issue presented by *Griffin* and *Krauss* is whether the rule ought to be expanded under certain circumstances to encompass even untainted evidence where necessary to deter egregious police conduct.

"*Krauss* and *Griffin* involve circumstances inviting intentional and extensive violation of Fourth Amendment rights through police practices without independent justification. Even were we inclined to apply the exclusionary rule in the context of these cases, we would find the instant case to be distinguishable. "Had the state's seizure of defendants' papers been lawful, federal examination of that evidence while in the possession of the state would not have constituted an independent 'search' necessitating the execution of a search warrant. See *U. S. v. Gargoeto* [sic], 476 F.2d 1009 (6th Cir. 1973), cert. denied 421 U.S. 987 [95 S.Ct. 1990, 44 L.Ed.2d 477] [1975]; *U. S. v. DeBerry,* 487 F.2d 448 (2d Cir. 1973); *Gullett v. U. S.,* 387 F.2d 307 (8th Cir. 1967), cert. denied 390 U.S. 1044 [88 S.Ct. 1645, 20 L.Ed.2d 307] [1968]; *U. S. v. Nugent,* 389 F.Supp. 817 (W.D.Louisana [sic] 1975); but Cf. *U. S. v. Birrell,* 470 F.2d 113, 117 (2d Cir. 1972). This rule appears largely designed to avoid complex procedural barriers to cooperation between state and federal law enforcement authorities. Its theoretical underpinning must be that examination by another law enforcement agency is not a sufficiently distinct intrusion into the defendants' privacy to trigger the requirements of the Fourth Amendment.

"While federal examination of documents unlawfully seized by the state is clearly an 'exploitation' of the *state's* unlawful seizure, the fruits of which are barred from federal court, *Elkins v. United States,* 364 U.S. 206 [80 S.Ct. 1437, 4 L.Ed.2d 1669] (1960), whether such conduct prior to suppression by the state

court constitutes a federal 'search,' and thus an independent violation of the Fourth Amendment, is less than clear. The analogy to *Krauss* and *Griffin* may fail for this reason alone. In any event, it is evident that the potential for intrusive conduct by police under the circumstances of the instant case is vastly less than sanctioned by *Krauss* and rejected by *Griffin.* See *United States v. Bacall,* 443 F.2d 1050, 1057 (9th Cir. 1971). Nor do we believe that this procedure furnished a significant incentive for the initial unlawful search by state authorities. "Moreover, collateral policy considerations militate against application of the exclusionary rule in this context. Before utilizing evidence seized by the state, federal authorities under such a rule would be obligated to conduct an independent inquiry and evaluation into the lawfulness of a state seizure. Where doubt as to legality persisted, federal authorities would either have to suspend their investigation until the completion of suppression proceedings, or seize or subpoena the evidence while it was still the subject of proceedings before the state courts. We think that the effects of the rule urged by defendants would be unduly burdensome in either case, while only marginally protective of rights secured by the Fourth Amendment."

"³ See e. g., *United States v. Calandra,* 414 U.S. 338 [94 S.Ct. 613, 38 L.Ed.2d 561] (1974); *Harris v. New York,* 401 U.S. 222 [91 S.Ct. 643, 28 L.Ed.2d 1] (1971); *Walder v. United States,* 347 U.S. 62 [74 S.Ct. 354, 98 L.Ed. 503] (1954). The requirement of 'standing,' *Alderman v. United States,* 394 U.S. 165 [89 S.Ct. 961, 22 L.Ed.2d 176] (1969), and the doctrine of harmless error, *Chapman v. California,* 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705] (1967) also derive in part from these considerations."

Nor does that rationale run afoul of *Elkins* where the "silver platter" doctrine received its death knell.[6]  *Elkins* held that "evidence obtained by state officers during a search which, if conducted by federal officers, would have violated the defendant's immunity from unreasonable searches and seizures under the Fourth Amendment is inadmissible over the defendant's timely objection in a federal criminal trial." *Id.* at 223, 80 S.Ct. at 1447. A federal warrant was issued in *Elkins*; however, it was directed to the bank where local officials had placed the evidence for safekeeping. The affidavit in support of the federal warrant was founded upon the advice and information received on a "silver platter" from state officers after their illegal seizure. The Government never claimed that the evidentiary use of the tape recordings in question was justified under the force of the federal warrant, but only that such use was justified by the "silver platter" doctrine. The opinion in *Elkins* is silent as to the validity or invalidity of the federal warrant and only holds that federal officers in such a situation fall into the shoes of the errant state officers and are subjected to the exclusionary rule. The issue of the purity and viability of an independent federal investigation and gathering of a factual basis of probable cause for the issuance of a warrant was not presented in *Elkins* as indeed there were none.

Here the Government makes no claim of lawful evidentiary use of the evidence seized via the outdated "silver platter" doctrine, but on the contrary, it claims lawful usage of the evidence seized through the force of a valid federal search warrant and seizure based on knowledge from untainted evidence independently gathered and unrelated to the illegal state warrant and seizure thereunder.[7]

6. The "silver platter" doctrine, a phrase conceived by Justice Frankfurter in *Lustig v. United States,* 338 U.S. 74, 69 S.Ct. 1372, 93 L.Ed. 1819 (1949), referred to the procedure whereby evidence illegally seized by state officers could be admitted in federal court so long as federal officers did not participate in the illegal seizure. If the state officers illegally seized evidence and handed it over to the federal officers on a "silver platter," it was admissible.

7. An examination of the record in *Elkins* at the District Court level discloses that while the state officers held possession of the evidence, consisting of reels of wiretap recordings, they invited the federal officers to listen to them. The federal officers did so. Thereafter the state officers placed the tapes in a safe deposit box for safekeeping. In *Elkins,* unlike here, the state court had not ordered a return of the wiretap evidence to any person. In fact, nei-

■ The Government's failure to inform the United States Magistrate in its affidavit for the federal search warrant that the evidence sought under the federal warrant had been previously suppressed by the state court is not a basis for invalidating the federal warrant.[8] The state warrants were held unlawful because they were general warrants, "on their face constitutionally overbroad as to the description of the property to be seized." That infirmity did not go to a lack of factual establishment of probable cause so, here, a lack of advice about the overbroad state warrants was not material to the Magistrate's finding of probable cause. *See generally United States v. Hole,* 564 F.2d 298 (9th Cir. 1977); *United States v. Taxe,* 540 F.2d 961 (9th Cir. 1976), *cert. denied,* 429 U.S. 1040, 97 S.Ct. 737, 50 L.Ed.2d 751 (1977); *United States v. Damitz,* 495 F.2d 50 (9th Cir. 1974).

## II. *Speedy Trial Rights.*

Forster next raises various contentions relating to delay prior to his federal indictment. As explained in *Arnold v. McCarthy,* 566 F.2d 1377, 1381–82 (9th Cir. 1978):

"[There are] two separate safeguards against delay in the different stages of the investigation and prosecution of a crime. In the pre-indictment or pre-arrest stage delay is tested by the general proscriptions of due process. . . . Pre-indictment delay is permissible unless it violates 'fundamental conceptions of justice which lie at the base of our civil and political institutions.' *Rochin v. California,* 342 U.S. 165, 173, 72 S.Ct. 205, 96 L.Ed. 183 . . . (1952). [Citations omitted].

"But once a person becomes 'accused' the more stringent requirements of the Sixth Amendment speedy trial right apply. One becomes 'accused' when there is 'either a *formal indictment or information* or else *the actual restraints* imposed by

arrest *and holding to answer a criminal charge* . . . .' *United States v. Marion,* 404 U.S. 307, 320, 92 S.Ct. 455, 463, 30 L.Ed.2d 468 . . . (1971). (Emphasis added). At this stage, although standards are still imprecise, the courts have been more willing to find delay to be constitutionally impermissible."

■ Forster contends that the date of his state arrest should be deemed the initiation of federal prosecution because "a federal prosecution could have taken place as early as the state prosecution." As we held in *United States v. Cordova,* 537 F.2d 1073 (9th Cir.), *cert. denied,* 429 U.S. 960, 97 S.Ct. 385, 50 L.Ed.2d 327 (1976), the "speedy trial right under the Sixth Amendment [is] not activated until the date of *federal* 'accusation.'" (Emphasis added). *Id.* at 1075.

In *United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), the Supreme Court, in dealing with a period of three years between the occurrence of the alleged criminal acts and the filing of the indictment, held that the defendants became "accused" and that the Sixth Amendment protection attached upon the return of a federal indictment. But the Court also ruled that "[i]nvocation of the speedy trial provision . . . need not await indictment, information, or other formal charge." *Id.* at 321, 92 S.Ct. at 463. Forster relies on, *inter alia, United States v. DeTienne,* 468 F.2d 151 (7th Cir. 1972), *cert. denied,* 410 U.S. 911, 93 S.Ct. 974, 35 L.Ed.2d 274 (1973), where the Court stated that "[o]f course, if the crimes for which a defendant is ultimately prosecuted really only gild the charge underlying his initial arrest and the different accusatorial dates between them are not reasonably explicable, the initial arrest may well mark the speedy trial provision's applicability as to prosecution for all the interrelated offenses." *Id.* at 155. Such a situation was not present in *DeTienne* nor is it to be found here. We agree

---

ther Elkins nor codefendant Clark made any claim to the reels of wiretap recordings.

**8.** Romero and Forster's reliance on *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d

669 (1971), and their contention that federal prosecution is barred by collateral estoppel are meritless.

with the District Court's conclusion that "the federal prosecution of defendants was initiated only at the time defendants were indicted on federal charges."

Lastly, we see no evidence indicating that Forster was prejudiced in his ability to conduct his defense. The District Court recognized the appellants had suffered financially during the state and federal proceedings, but found that "there is no basis upon which to conclude that defendants have been denied a fair trial." We agree.

### III. *Grand Jury Proceedings.*

Romero and Forster lastly argue that the grand jury process was abused. They contend that the evidence submitted before the grand jury was insufficient to establish probable cause. Addressing a similar contention in *United States v. Basurto,* 497 F.2d 781, 785 (9th Cir. 1974), we held that:

> "It is clear, however, that when a duly constituted grand jury returns an indictment valid on its face, no independent inquiry may be made to determine the kind of evidence considered by the grand jury in making its decision. *Costello v. United States,* 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 . . . (1956). To do so would further invade the independence of the grand jury." *See also United States v. Fried,* 576 F.2d 787, at 791–792 (9th Cir. 1978).

■ We agree with the District Court's statement that "[a]lthough a complete absence of evidence might serve to invalidate an indictment, see *Costello v. United States, supra* at 364, 76 S.Ct. 406 (Burton, J. concurring) and *United States v. Tane,* 329 F.2d 848, 853–54 (2d Cir. 1964), we do not find a complete absence of competent evidence here." Further, it is well established that a grand jury may return an indictment based solely upon hearsay evidence. *Costello.*

■ Secondly, Romero and Forster complain of the prosecution's failure to provide the grand jury with a letter from Forster's counsel allegedly containing exculpatory evidence. Contrary to the obligation imposed upon the prosecution at trial, the Government is not required to present all evidence that might be exculpatory to a grand jury. *See Loraine v. United States,* 396 F.2d 335, 339 (9th Cir.), *cert. denied,* 393 U.S. 933, 89 S.Ct. 292, 21 L.Ed.2d 270 (1968); *United States v. Chanen,* 549 F.2d 1306 (9th Cir. 1977). Regarding the content of the letter, the District Court ruled that "[t]he evidence sought to be presented did not clearly negate guilt or undermine the authority of the grand jury to act, see *United States v. Mandel,* 415 F.Supp. 1033, 1041–42 (D.Md. 1976)." We agree.

The separate judgments of conviction and sentences to custody entered by the District Court on August 10, 1977 are each affirmed.

AFFIRMED.

MERRILL, Circuit Judge, dissenting:

I dissent from the judgment and from part I of the opinion. I concur with parts II and III. Even as to part I, I agree with much of Judge East's discussion. I have no quarrel with the ruling that the federal search warrants were founded on information obtained from sources independent of any tainted examination of the materials improperly seized by the state. I do not question the federal seizures from Romero's home or Forster's business office of documents theretofore returned by the state. I do not contend that the invalidity of the seizure conferred upon the seized materials permanent immunity from seizure. Once suppressed material is back in the hands of the defendants in my view it is once more subject to seizure, assuming that the warrant under which it is seized is free from taint and that the basis for the earlier suppression does not continue to exist. My trouble with part I relates only to the search of the office of the state prosecutor and the seizure of materials found there.

I review the facts briefly. State officers seized documents from the defendants' premises under a defective warrant. The seized evidence was suppressed by court order. The United States then secured a warrant (avoiding the state defects) to

**400**

search the quarters of the state prosecutor where the suppressed evidence was to be found. The state prosecutor refrained from returning the evidence until federal seizure had been accomplished. In my judgment the order of suppression, carrying with it a duty on the part of the state to return the seized documents, rendered those documents immune from federal seizure so long as they remained in the hands of the state officials.

To me this result is compelled by *Elkins v. United States,* 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960). I am unable to distinguish that case as Judge East has done on the ground that the federal warrant there was not free from taint as were the warrants here. The Supreme Court placed no reliance on that fact. However, accepting arguendo that the rationale of *Elkins* would permit a distinction on that ground, I still adhere to my view that suppressed materials are immune from federal seizure while they remain in the hands of the state.

I find it repugnant to principles of federalism to allow the United States willy-nilly to search state offices and seize from state officials materials held by them as evidence in a state prosecution. Such sharing of evidence certainly should be tolerated only when it comes with the state's consent and willing co-operation. When the state, under a suppression order, is under a duty to return the evidence it is in no position to consent to such a sharing. Permitting seizure under these circumstances serves to frustrate the state in carrying out its high purpose and the United States should not be a party to such frustration. This was made clear in *Elkins,* where the Court stated:

> "[W]hen a federal court sitting in an exclusionary state admits evidence lawlessly seized by state agents, it not only frustrates state policy, but frustrates that policy in a particularly inappropriate and ironic way. For by admitting the unlawfully seized evidence the federal court serves to defeat the state's effort to as-

sure obedience to the Federal Constitution."

364 U.S. at 221, 80 S.Ct. at 1446.

The fact that some state officers may be willing to co-operate with federal officials in frustrating the state purpose (as apparently was the case here) cannot affect the result. Where suppression is ordered the state duty is clear and a knowing disregard of that duty by state officers does not serve to wipe it out or justify a federal disregard of it.

I would reverse.