**Ramon CEPEDA, Petitioner,**

v.

**Robert J. HENDERSON, Superintendent of Auburn, Respondent.**

No. 78 Civ. 2964.

United States District Court,
S. D. New York.

Feb. 14, 1979.

Ramon Cepeda, pro se.

Robert Abrams, Atty. Gen., State of New York, New York City, for respondent, by Paul E. Milbauer, Deputy Asst. Atty. Gen., New York City, of counsel.

## OPINION

WHITMAN KNAPP, District Judge.

David Frazier was shot to death on a street corner in the Bronx in May of 1974. Petitioner Ramon Cepeda was arrested about two months later and charged with that murder. He was tried before a jury in state court, found guilty, and sentenced to a term of twenty-five years to life. He now applies for a writ of habeas corpus under 28 U.S.C. § 2254, challenging the validity of that conviction and sentence. He claims (1) that pre-trial identification procedures were

unnecessarily suggestive, (2) that he was denied his Sixth Amendment right to confront witnesses by the introduction of hearsay evidence, and (3) that prosecutorial misconduct before the grand jury deprived him of due process. For reasons that follow, we deny the petition.

### Facts

Testimony at petitioner's trial established that on the evening of May 10, 1974, David Frazier was standing with six other young men on the corner of Harrison Street and Kingsland Place in the Bronx. The group had formed at about 9:00 P.M. that evening. Its members had been sharing one or two six-packs of beer and telling jokes when, at about 11:20 P.M., two men walked up Harrison Street towards the group. They stopped when they reached the youths and demanded to know whether they were the target of the youths' laughter. One of the youths assured them that they were not and they continued on their way. They had not gone very far, however, when renewed laughter erupted from the group. The two men turned around and again approached the youths—this time with drawn guns. One of the men ordered everyone not to move. The other man, who was the taller of the two, strode into the center of the group and asked the young men if they were looking for trouble. Without waiting for an answer, he struck one Neil Miller, who happened to be Frazier's cousin, across the face with his gun. Frazier at that point stepped forward, away from the car against which he had been leaning. Waving his pistol, the taller man announced that he was looking for someone to kill that night and if they weren't careful, it could be one of them. He pointed his gun at Frazier and said "So you're not afraid of this." He then shot Frazier in the face from point-blank range and fled with his companion.

Police arrived on the scene shortly after the shooting. The five witnesses [1]—Neil Miller, Jose Perez, Karl Pacheco, Stuart Pacheco, and Jose Marquez—then accompanied police officers to a local precinct house where they looked through bins containing hundreds of photographs. Petitioner's photograph was not among them and none of the witnesses at that time selected any photograph as depicting the killer. They did, however, select several photographs of persons whom they found to resemble him.

The witnesses continued their cooperation with the police, viewing photo arrays on several other occasions. In July of 1974, about two months after the killing, Neil Miller and Karl Pacheco selected photographs of petitioner, from arrays containing ten and eighteen photos respectively, as the man who shot David Frazier. After viewing arrays on at least five occasions without identifying anyone, Jose Perez also made a photo identification of petitioner as the killer from a folder containing about twenty photos.[2]

Several witnesses also identified photographs of one Jesus Milan as the killer's companion. Milan was never apprehended.

Before trial, a *Wade* hearing [3] was held on the questions of whether pre-trial identification procedures were unnecessarily suggestive and if so, whether such suggestiveness produced a likelihood of irreparable misidentification. Nothing brought out at the *Wade* hearing indicates any suggestiveness in the pre-trial procedures in which Jose Perez, Karl Pacheco, and Stuart Pacheco participated. Jose Marquez, however, testified that when he was shown an array

---

1. The seventh member of the group, Juan Rubiano, left the scene sometime during the second confrontation and before the shooting. He did not accompany the police officers to the precinct house that night and did not testify at trial.

2. The record is somewhat confused as to the date of Perez' photo identification. Perez himself estimated that it "could have been about nine months" after the shooting. He also testified, however, that he did not remember whether the identification had been made before his grand jury testimony on July 16, 1974—just over nine *weeks* after the shooting. Detective Rudolph Francis, who was present when Perez selected petitioner's photograph, testified that that identification was made on July 5, 1974, less than nine weeks after the incident.

3. *United States v. Wade* (1967) 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149.

of five or six photos, a detective pointed to one photo and said, "This is one of them." Marquez could not recall whether the photo was of petitioner or some other person (such as Milan) and indeed, could not remember whether he had ever been shown a photograph of petitioner. Despite the attention called to the one photograph, Marquez made no photo identification, either at this or any other time.

Neil Miller testified at the *Wade* hearing that on one occasion before he was shown an array, Detective Rudolph Francis told him that police had arrested a suspect and that he, Miller, should be able to select his photo from the ten photos in the array since he had already drawn a picture of the killer. There is no indication that anyone or anything called attention to any particular photo or photos in the array. Miller further testified that he asked Detective Francis if he could view a line-up at that time and that his request was refused. Detective Francis, in his *Wade* testimony, presented a different picture of the events surrounding Miller's view of the array. He denied telling Miller that police had a suspect in custody, that he (Miller) should be able to select the suspect's photo, and that Miller had asked to see a line-up. As noted above, Miller identified a photograph of petitioner as the killer.

Like the other witnesses, Miller had observed the killer for a few seconds during the first confrontation and for a minute or two during the second. Like the others, he had stood two to five feet away from him on both occasions and observed him under the light of a nearby street lamp. Each of the witnesses had drunk a can or two of beer before the shooting.[4]

At the conclusion of the *Wade* hearing, Justice Donald Sullivan, the state trial judge, denied the motions to suppress evidence of identifications made by Jose Perez,

Karl Pacheco, Stuart Pacheco, and Neil Miller. He found no suggestiveness in the procedures in which they participated and none, in any event, that would produce a substantial likelihood of irreparable misidentification. Justice Sullivan did not, however, rule on the propriety of the procedure in which Marquez participated, expressly finding the question of such propriety to be beyond the purview of the *Wade* hearing. He did, however, allow Marquez to testify. Like the four other eyewitnesses, Marquez positively identified petitioner at trial as the killer.

At trial, the prosecution also presented as a rebuttal witness one Juan Rivera, who testified that on the night of the shooting he had been driving in the Bronx with petitioner and a man he thought was petitioner's cousin, looking for another man who had knifed Santos Cepeda, petitioner's brother. At one point, petitioner and his "cousin" got out of the car to conduct their search on foot. They came running back to the car a short time later. Rivera testified that after they returned to the car, petitioner's "cousin" told Rivera that they had "just shot a colored guy."

The jury returned a guilty verdict on January 19, 1976, after about five hours of deliberations. Petitioner was sentenced on February 19, 1976 by Justice Sullivan to a term of twenty-five years to life.

On appeal, four justices of the Appellate Division found error in the admission of petitioner's "cousin's" statement. These justices held that the statement did not come within any of New York's exceptions to the hearsay rule and further questioned whether its admission violated petitioner's Sixth Amendment right to confront the witnesses against him. The court affirmed the conviction, however, finding the error to be harmless beyond a reasonable doubt.[5]

---

**4.** Several witnesses apparently had taken one or two puffs on a marijuana cigarette earlier in the evening. According to testimony, however, this drug use did not impair their perceptions or alertness.

**5.** The fifth justice, Justice Silverman, thought that petitioner's "cousin's" statement came

within New York's exception to the hearsay rule for statements against the penal interest of the declarant and found no constitutional error in its admission. He agreed with the other justices, however, that the error, if any, was harmless.

*People v. Cepeda* (1st Dept. 1978) 61 A.D.2d 962, 403 N.Y.S.2d 248. Leave to appeal to the Court of Appeals was denied. 44 N.Y.2d 952, 408 N.Y.S.2d 1031, 380 N.E.2d 341. Having exhausted his state remedies, petitioner brought this application for habeas relief.

### Discussion

Petitioner now claims that pre-trial identification procedures were unnecessarily suggestive, that admission of the hearsay statement deprived him of his Sixth Amendment confrontation rights, and that prosecutorial misconduct before the grand jury deprived him of due process.

■ We first consider his identification claims. The state trial judge conducted an extensive hearing on the subject and found no impropriety in the procedures in which Jose Perez, Stuart Pacheco, Karl Pacheco, and Neil Miller participated. That conclusion is entitled to great weight here, *United States ex rel. Pella v. Reid* (2d Cir. 1975) 527 F.2d 380, 384, and our independent review of the evidence has disclosed no basis for disturbing it.

■ Nor do we find error in the admission of Jose Marquez' positive in-court identification of petitioner. As noted, Marquez testified at the *Wade* hearing that a detective pointed to one of several photographs in an array and identified it to him as depicting a suspect in the case. This procedure was clearly improper. Under *Simmons v. United States* (1968) 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247, however, this impropriety would provide grounds for setting aside the conviction only if, under all the circumstances, "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Id.* at 384, 88 S.Ct. at 971. See also *Manson v. Braithwaite* (1977) 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140, *Neil v. Biggers* (1972) 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401. Even assuming that the photo

singled out was one of petitioner, the claim that the suggestion produced any likelihood of misidentification here is met by convincing evidence of the insignificant effect that it had upon Marquez. Although the detective singled out a particular photograph, Marquez resisted his suggestion and did not identify this or any other photograph. And even if the detective's action did have an effect on Marquez at the time of the array, such effect would have been completely dissipated in the eighteen months between the array and the trial. Indeed, at the time of the trial, Marquez could not recall whether the photograph pointed out by the detective had been one of petitioner. Nor could he remember whether he had ever viewed a photograph of petitioner. Finally, we stress that Marquez—like the other witnesses—had an opportunity to view the killer for a significant period of time, from a distance of only two to five feet, under adequate lighting, and under circumstances likely to rivet an observer's attention upon him. At trial, Marquez, again like the other witnesses, was sure that petitioner was the man who shot David Frazier.[6] Under these circumstances, we find no basis for the claim that any suggestiveness in identification procedure produced a substantial likelihood of irreparable misidentification.

■ Petitioner also claims that the failure of police to conduct a line-up in spite of Neil Miller's request to view one deprived him of due process of law. We cannot agree. The Court of Appeals for this Circuit has repeatedly held that a trial court does not violate due process in rejecting a defendant's request to appear in a line-up. *United States v. Estremera* (2d Cir. 1976) 531 F.2d 1103, 1111; *United States v. Ravich* (2d Cir. 1970) 421 F.2d 1196, 1203, *cert. denied* 400 U.S. 834, 91 S.Ct. 69, 27 L.Ed.2d 66. Also see *United States ex rel. Pella, supra; United States v. Boston* (2d Cir. 1974) 508 F.2d 1171, *cert. denied* (1975) 421 U.S. 1001, 95 S.Ct. 2401, 44 L.Ed.2d 669.

---

6. Marquez was less certain in his in-court identifications than the other witnesses. Although he was not positive at the Wade hearing that

petitioner was the killer, he testified at trial that he was then sure of his identification.

We believe that the same rule applies where a line-up is requested by a witness.

■ We next consider petitioner's claim that the admission of hearsay statements violated his Sixth Amendment right to confront witnesses against him. As we have indicated, the Appellate Division held that the extra-judicial statements admitted into evidence through Rivera's testimony did not come under any of New York's exceptions to the hearsay rule. Since, however, the confrontation clause is not co-extensive with state hearsay rules (*Dutton v. Evans* (1970) 400 U.S. 74, 81–82, 91 S.Ct. 210, 27 L.Ed.2d 213; cf. *United States v. Wright* (2d Cir. 1978) 588 F.2d 31, at 37), this finding of state evidentiary error does not end our inquiry.[7] Rather, *Dutton v. Evans, supra,* as interpreted by the Court of Appeals for this Circuit, mandates a case-by-case evaluation of extra-judicial statements to determine whether a particular statement is sufficiently reliable to warrant its admission despite the lack of opportunity for cross-examination. See *Wright, supra; United States v. Puco* (2d Cir. 1973) 476 F.2d 1099, *cert. denied* 414 U.S. 844, 94 S.Ct. 106, 38 L.Ed.2d 82. As the Court noted in *Puco, supra* at 1103, "some statements are, because of their content or the circumstances in which they were uttered, obviously reliable even in the absence of cross-examination of the declarant." The extra-judicial statements here were of this variety. First, we find no possibility that they were the product of faulty recollection. They were made immediately after the shooting and were limited to events the declarant would not be likely to forget. Second, there is no reason to believe that the declarant substantially misrepresented the events since he implicated himself, as well as petitioner, in the shooting.[8] Most importantly, his statement is corroborated by the testimony of Rivera, placing petitioner and his "cousin" in the vicinity of the shooting at the time it occurred; of the coroner, who identified the victim of the shooting as a black male; and of the five eye-witnesses, who described the shooting and positively identified petitioner, who was accompanied by another man, as the killer. In light of the overwhelming evidence, we find that the extra-judicial statements were neither crucial to the prosecution nor devastating to the defense. We conclude that such statements bore sufficient indicia of reliability to justify their admission despite the absence of cross-examination and reject petitioner's Sixth Amendment claim.

■ Nor do we find merit in his final claim of prosecutorial misconduct before the grand jury. Petitioner's theory is that the indictment was defective because the prosecutor presented Karl Pacheco as a witness before the grand jury without introducing evidence that Pacheco's pre-trial photo identification had been less than absolutely certain. We agree with the Court of Appeals for the Ninth Circuit that "[c]ontrary to the obligation imposed upon the prosecution at trial, the Government is not required to present all evidence that might be exculpatory to a grand jury." *United States v. Romero* (9th Cir. 1978) 585 F.2d 391, 399. Also see *United States v. Thomas* (5th Cir. 1978) 567 F.2d 638, 642; *Loraine v. United States* (9th Cir. 1968) 396 F.2d 335, 339, *cert. denied* 393 U.S. 933, 89 S.Ct. 292, 21 L.Ed.2d 270; cf. *United States v. Calandra* (1974) 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561; *Costello v. United States* (1956) 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397.

We deny the application for the writ and direct the clerk to enter judgment dismissing the petition.

SO ORDERED.

---

7. State error, of course, does not by itself possess the constitutional stature required for federal habeas review. *United States ex rel. Stanbridge v. Zelker* (2d Cir. 1975) 514 F.2d 45; *Schaefer v. Leone* (2d Cir. 1971) 443 F.2d 182.

8. Nor do we believe that the reliability of the statements is weakened to any significant extent by the fact that upon further examination Rivera testified that the "cousin" had named petitioner as the person who pulled the trigger. His declarations, as any layman would appreciate, still implicated him in the shooting.