UNITED STATES of America

v.

Hector ADAMES, Defendant.

No. 79 CR 308.

United States District Court,
E. D. New York.

March 3, 1980.

E. R. Korman, U.S. Atty., E. D. N. Y. by Diane Giacalone, Asst. U.S. Atty., Brooklyn, N.Y., for plaintiff.

Sparrow, Sparrow, Singer & Beck by Sidney G. Sparrow, Kew Gardens, N.Y., for defendant.

## MEMORANDUM AND ORDER

PLATT, District Judge.

Defendant, Hector Adames, has been charged in a two count indictment filed May 17, 1979, with knowingly receiving and possessing stolen goods in interstate commerce, in violation of 18 U.S.C. §§ 2, 659. Defendant is alleged to have received and possessed approximately 757 cartons of Maxwell House Mellow Roast Instant Coffee, stolen from a shipment from Hoboken, New Jersey, to Arlington, Texas, and approximately 2948 cartons of Sergeant's Flea & Tic Collars, stolen from a shipment from Richmond, Virginia, to Los Angeles, California.

Defendant has moved to suppress physical evidence seized from and statements made by the defendant on March 1, 1979, when Special Agents of the Federal Bureau of Investigation ("F.B.I.") conducted two warrantless searches and a later search pursuant to a warrant which revealed stolen goods to be in the possession of defendant. Defendant argues that the affidavit on which the search warrant was based was irreparably tainted by an assertedly illegal search by New York City police officers carried out a week earlier. Defendant has also moved for dismissal of the indictment on the basis of a duplicative conviction in the Criminal Court of the City of New York, following a guilty plea entered on March 13, 1979, approximately one month prior to the filing of the instant indictment.

I

FACTS

The Court held a hearing on August 31, September 28, and November 8, 1979. The facts developed at the hearing are as follows:

On February 15, 1979, the Manhattan and Brooklyn-Queens offices of the F.B.I. became involved in the investigation of the hijacking of a shipment of Maxwell House Mellow Roast Coffee, which had occurred January 12, 1979, in Newark, New Jersey. Both F.B.I. offices received teletypes detailing the hijacking and indicating that a General Foods Corporation employee had subsequently observed an individual selling cases of Maxwell House Mellow Roast Coffee from the back of a van bearing a New York license plate. The teletypes directed both F.B.I. offices to pursue the investigation by ascertaining and interviewing the registered owner of the van. (Tr. 44–47).[1]

Employing customary investigative techniques, F.B.I. Special Agent Alan V. MacDonald, of the Brooklyn-Queens office, determined that the van was registered to the Bensonhurst Leasing Corporation in Brooklyn. About a week later, on February 23, Agent MacDonald and two other F.B.I. agents interviewed the manager of Bensonhurst Leasing, one Vincent Bonafeta, about the identity of the lessee of the van. Mr. Bonafeta, relying on Bensonhurst Leasing records, indicated that the van was leased by one James McMahon of Brooklyn. On February 26, Agent MacDonald, again accompanied by two other F.B.I. agents, interviewed Mr. McMahon at his home. (Tr. 47–50). Mr. McMahon told the agents that he earned his livelihood by selling from his van various products that he had acquired "at flea markets and close-out sales, and things of this nature." (Tr. 50). The agents learned that he had recently purchased a quantity of Mellow Roast Coffee from a distributor in Brooklyn, a transaction for which Mr. McMahon produced a receipt. (Tr. 50–51). The receipt identified the distributor as "Pal Pick & Pay", a "Division of Hector Adames Distributors," located at 318 Gates Avenue in Brooklyn. (Government's Exhibit 4).

Mr. McMahon volunteered that he still had some of this coffee in his warehouse, which the agents subsequently examined with McMahon's explicit consent. One of the agents, Neil Moran, noted the serial numbers of fourteen of the cartons, selected at random. Two days later, February 28, Agent Moran contacted an official of General Foods Corporation (the manufacturer of Maxwell House Mellow Roast Coffee) and learned that two of the fourteen five-digit numbers differed only slightly from two of the cartons stolen in the January 12th hijacking. (Tr. 52–54; 144–145). During this conversation, the General Foods official expressed the opinion that the coffee purchased by McMahon from Pal Pick & Pay was from the stolen shipment. He based this opinion on the similarity of the serial numbers, the fact that General Foods had never sold Maxwell House coffee to Pal Pick & Pay, and the relatively small amount of Maxwell House coffee distributed to the metropolitan New York area in the immediately preceding two months. (Tr. 146–147).

In the afternoon of February 26, after the interview with Mr. McMahon but before the conversation with the General Foods official, Agents MacDonald and Moran returned to the Brooklyn-Queens F.B.I. office to find that the New York City Police Department ("N.Y.P.D.") had communicated certain information to it, through the Manhattan F.B.I. office. The communication briefly described an N.Y.P.D. investigation which had resulted in the seizure of stolen property from the Pal Pick & Pay distributorship at Gates Avenue and a Pal Pick & Pay warehouse at 61 Clifton Place on February 24. Agent Moran and another agent immediately went to interview N.Y.P.D. Sergeant Albert Jeffries, the officer principally involved in the investigation, who re-

---

1. References in the form "Tr.     " are to pages of the transcript of the suppression hearing.

lated to them the details.[2] (Tr. 56–58; 113–117; 148–152).

Three days later, on March 1, while Agent Moran attempted to obtain a search warrant for the Pal Pick & Pay warehouse on Clifton Place, Agent MacDonald received information from the N.Y.P.D. to the effect that a truck there was being loaded with merchandise, including coffee. (Tr. 69–70; 118–119). Agent MacDonald relayed this information to Agent Moran and proceeded with another agent to the warehouse, where he was met by N.Y.P.D. officers and detectives. The doors to the warehouse were closed; outside stood a flat-bed truck with two men seated in the cab and another man alongside on the sidewalk. In response to Agent MacDonald's question, the man on the sidewalk identified himself as Hector Adames, the defendant here. Agent MacDonald then orally advised Mr. Adames of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Mr. Adames indicated orally that he understood his rights. (Tr. 71).

Again in response to Agent MacDonald's question, Mr. Adames stated that he was the owner of the truck and the warehouse, and that the truck was being loaded for a trip to the Gates Avenue store. Another F.B.I. Agent then read to Mr. Adames the standard F.B.I. consent to search form, and advised him that he did not have a search warrant and that Mr. Adames could refuse to consent to a search of the truck and the warehouse. Mr. Adames refused to sign the consent form but, stating that "he knew what he was doing," orally consented to a search of the truck. (Tr. 72–73). Agent MacDonald entered the truck, observing various items of merchandise, including cartons of Maxwell House Mellow Roast Instant Coffee. (Tr. 74; 92; 125–126). Mr. Adames stated that the items belonged to him, and in response to a question from Agent MacDonald, stated that he had bills of sale for the items at the Gates Avenue store, which he "would be happy to show" to Agent MacDonald and the N.Y.P.D. officers. (Tr. 74; 93; 127).

The agents and Mr. Adames drove to the Gates Avenue store, where Mr. Adames was again advised of his rights and advised that the agents did not have a warrant and would need his consent to search the premises. Mr. Adames indicated that he understood, and consented to a search of the store. (Tr. 74–75; 93–94). After Mr. Adames removed the bolts from heavy doors to the storage area and rigged a light for better illumination, Agent MacDonald entered the area and observed cartons and a sale display of Sergeant's Flea and Tic Collars. Based on an earlier conversation with an official of the A. H. Robbins Corporation, the manufacturer of the collars, Agent MacDonald concluded that the merchandise

2. Briefly, the investigation had proceeded as follows:

On February 22, a truck owned by Dubovsky and Sons Wholesale Grocers had been hijacked, and the driver thrown into the rear of the truck while it was driven to an unknown location to be unloaded. Looking through tiny holes in the rear of the truck, the driver attempted to determine where the truck was being driven. After his release, he and Mr. Gordon Brown, Dubovsky's warehouse general manager, determined that the truck had been unloaded at Pal Pick & Pay's Clifton Place warehouse, based on his recognition of the warehouse's sign, its blue concrete canopy, and nearby construction noise. While observing the warehouse, the two men saw a panel truck emerge; they followed the truck to the Pal Pick & Pay store on Gates Avenue.

Brown reported this to N.Y.P.D. Sergeant Albert Jeffries, who accompanied Brown back to the Gates Avenue store. Brown entered the store, which was open to the public, and purchased some items for his personal use. While inside, Brown recognized other items as Dubovsky merchandise, as well as a "tremendous" display of Sergeant's Flea and Tic Collars. The following day, February 24, Brown and Jeffries went to the Clifton Place warehouse and, by means of a ruse, induced one of the employees inside to open a side door, which they entered. Brown pointed out to Jeffries the stolen Dubovsky merchandise. Both men also noted huge quantities of Mellow Roast Coffee and Sergeant's Flea and Tic Collars. They then proceeded to the Gates Avenue store, where again Brown pointed out to Jeffries the stolen Dubovsky merchandise.

On the basis of the above, Sergeant Jeffries arrested Hector Adames, the owner of Pal Pick & Pay and the defendant here, on February 24. The stolen merchandise was subsequently recovered from the warehouse by Dubovsky employees.

had been stolen from a shipment in interstate commerce originating in Richmond, Virginia, the previous month. He so advised Mr. Adames, who then retracted his earlier statement that he had bills of sale for the items. Instead, he said, he had been storing the merchandise for a friend whose identity he did not wish to reveal. He indicated that he wished to answer no more questions about the merchandise. The agents then seized the Sergeant's Flea and Tic Collars. (Tr. 75–79; 93–95).

Mr. Adames, who had not yet been placed under arrest and who, according to Agent MacDonald, would have been free to leave (Tr. 127; 130), then accompanied the agents back to the Clifton Place warehouse, where Agent Moran had arrived with the search warrant in the interim. The agents showed Mr. Adames the warrant, again advised him of his rights under *Miranda, supra,* and asked if he understood his rights. Mr. Adames answered in the affirmative, reiterated that he was merely storing the merchandise for a friend, and said that he would make no further statements. The agents then arrested Mr. Adames and executed the warrant, seizing from the warehouse the coffee and flea and tic collars. The agents also seized from the truck the coffee previously observed there by Agent MacDonald. (Tr. 79–82; 92–93).

## II

### DISCUSSION

Defendant moves for suppression on two separate grounds: first, he argues that defendant's consents to search the truck outside the Clifton Place warehouse and the Gates Avenue store, pursuant to which physical evidence was seized, were given involuntarily, and that his contemporaneous statements were made involuntarily; second, he contends that the search warrant, which led to the seizure of physical evidence from the warehouse itself, was irreparably tainted by the asserted illegality of the earlier N.Y.P.D. search and seizure. *See* fn. 2, *supra.* We will address these arguments separately.

### A

#### The Consent Searches

▮ Among the specifically recognized exceptions to the warrant and probable cause requirements of the Fourth Amendment is the ability of a defendant to consent to a search and, impliedly, to any resulting seizure of physical evidence. *See, e. g., United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *see also United States v. Faruolo,* 506 F.2d 490 (2d Cir. 1974); *United States v. Ellis,* 461 F.2d 962 (2d Cir.), *cert. denied,* 409 U.S. 866, 93 S.Ct. 162, 34 L.Ed.2d 115 (1972). In one of the most recent enunciations of the test, the Supreme Court has stated that we must determine, in light of the "totality of the circumstances," whether a defendant's consent was his own "essentially free and unconstrained choice", not made because "his 'will ha[d] been overborne and his capacity for self-determination critically impaired.'" *Watson, supra,* 423 U.S. at 424, 96 S.Ct. at 828, *quoting Schneckloth, supra,* 412 U.S. at 225, 93 S.Ct. at 2046. There must be "no overt act or threat of force", nor "promises made" nor "more subtle forms of coercion" exercised. *Watson, supra,* 423 U.S. at 424, 96 S.Ct. at 828. In short, defendant's consent must be voluntary.

▮ The Government has the burden here of showing that defendant's consents to search the truck and the store were, in fact, freely and voluntarily given. *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968). This obligation, however, "should impose no greater burden than proof by a preponderance of the evidence" adduced at the suppression hearing. *Matlock supra,* 415 U.S. at 177 n. 14, 94 S.Ct. at 996; *see also Lego v. Twomey,* 404 U.S. 477, 488–89, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972). *But compare United States v. Fernandez,* 456 F.2d 638, 640 (2d Cir. 1972) (preponderance of the evidence) *with United States v. Mapp,*

476 F.2d 67, 77 (2d Cir. 1973) (clear and convincing evidence). We fully credit the Government's witnesses here and find that the Government has sustained its burden by clear and convincing evidence or more to demonstrate that defendant's consents to search were voluntarily made. In addition, we find that defendant acted voluntarily in making other statements at the same time.

The evidence shows that defendant was neither coerced nor threatened to induce his consent. The F.B.I. agents did not display weapons or physically abuse defendant. Most importantly, Agent MacDonald clearly advised defendant of his rights, as mandated by *Miranda, supra,* prior to eliciting any statements or consents to search. Defendant unequivocally indicated that he understood those rights. Further, Agent MacDonald advised defendant that the agents had no search warrant and that he could refuse to consent to a search. Defendant orally consented after being so advised, and we find the voluntariness of such consent to have been unaffected by his prior refusal to sign the standard F.B.I. consent form.[3] The agents' behavior and defendant's responses were virtually identical with respect to both the truck and the store, rendering the consents and statements by defendant voluntary in both places for the same reasons.

We note that the agents' actions to safeguard defendant's free choice went beyond those actually mandated by the Supreme Court and the Court of Appeals for this Circuit. Defendant was not yet in custody at the time he gave his consents, *see* Tr. 127, 130, and would have been free to leave had he chosen to do so, contributing to the strong inference of voluntariness. Even if he had already been arrested or otherwise placed in custody, that fact, standing alone, would not demonstrate coercion or undue influence. *Watson, supra,* 423 U.S. at 424, 96 S.Ct. at 828. And it

is also settled now that law enforcement officials are not required to advise a subject of his right to refuse to consent to a search or to advise him of his rights under *Miranda, supra,* in order to establish the voluntariness of a consent to search or other contemporaneous statements. *Schneckloth, supra,* 412 U.S. at 229–234, 93 S.Ct. at 2048–2051; *see also Faruolo, supra,* 506 F.2d at 495.

Considering all these factors, we conclude that defendant's consents to search both the truck and the store, as well as any accompanying statements, were made knowingly and voluntarily. We therefore deny defendant's motion to suppress the fruits of these searches and the statements.

## B

### *The Sufficiency of the Warrant*

Throughout the suppression hearing, defendant was at pains to establish the illegality of the prior N.Y.P.D. search and seizure, hoping to predicate upon it his claim that the subsequent federal search warrant for the warehouse was thereby irreparably tainted. Defendant's position apparently is that any showing that the federal warrant was based on information from the N.Y.P.D. regarding its search, once its illegality has been established, renders the warrant "fruit of the poisonous tree" and compels suppression of the evidence seized pursuant to the warrant.

We disagree, however, and take a narrower view of the issue. The important determination here is not whether the N.Y.P.D. search was illegal, but, rather, whether the federal warrant itself was properly based on probable cause and whether the affidavit supporting it was sufficient to establish probable cause. Because of this narrower scope of inquiry, we need not and do not make any determination as to the legality of the N.Y.P.D. search and seizure.[4]

---

**3.** Agent MacDonald testified at the suppression hearing that such inconsistent behavior among subjects of investigations was "not uncommon."

**4.** Indeed, the question arises whether defendant is properly situated to contest the legality of the N.Y.P.D. search in this proceeding. In the State prosecution flowing from the N.Y.P.D. search and seizure, defendant chose to

■ The controlling principle is that, even assuming the illegality of the N.Y.P.D. search and the transmission of critical information from the N.Y.P.D. to the F.B.I. prior to the federal warrant, the warrant is valid if the underlying affidavit contains enough information independently obtained to establish probable cause. "The ultimate inquiry on a motion to suppress evidence seized pursuant to a warrant is not whether the underlying affidavit contain[s] allegations based on illegally obtained evidence, but whether, putting aside all tainted allegations, the independent and lawful information stated in the affidavit suffices to show probable cause." *United States v. Giordano,* 416 U.S. 505, 555, 94 S.Ct. 1820, 1845, 40 L.Ed.2d 341 (1974) (Powell, J., concurring in part and dissenting in part). This rule, virtually unchallenged even before *Giordano, supra, see id.* at 555 and nn. 5 & 6, 94 S.Ct. at 1845 and nn. 5 & 6, has been recently re-affirmed by a number of the federal courts of appeals. *See, e. g., United States v. Romero,* 585 F.2d 391 (9th Cir. 1978), *cert. denied,* 440 U.S. 935, 99 S.Ct. 1278, 59 L.Ed.2d 492 (1979); *United States v. Watts,* 176 U.S.App.D.C. 314, 540 F.2d 1093 (D.C.Cir.1976); *United States v. DiMuro,* 540 F.2d 503 (1st Cir. 1976). And the Second Circuit has given no indication that the law in this Circuit is other than that stated in *United States v. Epstein,* 240 F.Supp. 80, 82 (S.D.N.Y.1965) (per Weinfeld) (footnote omitted): "[W]hen a warrant issues upon an affidavit containing both proper and improper grounds, and the proper grounds—considered alone—are more than sufficient to support a finding of probable cause, inclusion of the improper grounds does not vitiate the entire affidavit and invalidate the warrant."

■ Applying this rule to the underlying affidavit in this case, we find that the affidavit includes sufficient information gathered by the F.B.I. pursuant to its own investigation and independent of information received from the N.Y.P.D. relating to the latter's search of and seizure from defendant's premises to enable the issuing Magistrate to find probable cause. The testimony at the suppression hearing indicated that the F.B.I.'s investigation of two separate truck hijackings, which ultimately led to defendant's arrest, began a week prior to the N.Y.P.D.'s involvement with this defendant. In addition, we heard how the F.B.I.'s investigation had led to the interview with McMahon, who directly linked defendant to the goods stolen from the hijacked shipments, before the Brooklyn-Queens F.B.I. office received any information from the N.Y.P.D. And, significantly, the F.B.I. independently conducted telephone interviews with officials of the manufacturers of the stolen goods, which interviews further pointed in defendant's direction. All of this information found its way into the affidavit unaffected by any information from the N.Y.P.D.

enter a plea of guilty and to forego any pretrial attack on the search and seizure. By choosing to refrain from moving to suppress the fruits of the search defendant also lost the right to any State appellate determination of the issue. *See* New York C.P.L. § 710.70 (McKinney's 1971) (procedure allows preservation of issues for appeal only if pretrial suppression motion made, *whether or not defendant pleads guilty* following adverse decision on suppression motion); *see also People v. Muller,* 49 Misc.2d 626, 268 N.Y.S.2d 138 (1966); *People v. Williams,* 40 A.D.2d 586, 334 N.Y.S.2d 587 (4th Dept. 1972).

At the conclusion of the suppression hearing, the Court asked counsel to consider and brief the question whether this state of affairs might preclude defendant in this proceeding from basing any attack on the federal searches and seizures on the purported illegality of the State search, under the rule of *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), and its progeny. Defendant's counsel did so, arguing that the *Sykes* rule has no applicability here because of a number of distinctions in the procedural setting of this case. The Government takes the position that the *Sykes* rule and defendant's failure to move for suppression prior to his State guilty plea are "not relevant" here, in that the legality of the N.Y.P.D. search is not an issue presently before us. In light of our agreement with the latter proposition, we make no determination as to whether the *Sykes* rule could ever be dispositive in a situation where a prior State search and seizure, to which no "contemporaneous objection" to the admissibility of its fruits was made, is central to the disposition of a suppression motion in a subsequent federal prosecution.

In its post-hearing Memorandum of Law in opposition to defendant's motion, the Government argues that of the eight paragraphs in the affidavit, only one, or at most one and part of another, clearly contains information flowing directly from N.Y.P.D. action. Government's Memorandum at 24. We agree with the Government that the remaining paragraphs, standing alone, posit enough facts to establish probable cause. While we do not necessarily disagree with defendant's contention that the F.B.I. investigation gained momentum because of the N.Y.P.D. information, we do disagree with his conclusion that receipt of the information robbed the F.B.I. investigation of its independent vitality and irreparably tainted the federal warrant.[5]

■ We have borne in mind the limited standard of proof necessary for a showing of probable cause, see *Draper v. United States,* 358 U.S. 307, 311–12, 79 S.Ct. 329, 331–32, 3 L.Ed.2d 327 (1959), and the well-settled guideline that a Magistrate's determination of probable cause is entitled to "substantial deference". *Aguilar v. Texas,* 378 U.S. 108, 111, 84 S.Ct. 1509, 1512, 12 L.Ed.2d 723 (1964). These principles, combined with the facts presented here, lead us to deny defendant's motion to suppress the physical evidence seized pursuant to the warrant.

### III

One final point need detain us only briefly.

Defendant has also moved for dismissal of the indictment "in the interests of justice" on the ground that the offenses charged are duplicative of crimes for which defendant has already been convicted in a State court. We have held this motion in abeyance pending our disposition of the search and seizure issues considered above.

■ The motion must be denied. It is beyond peradventure that independent sovereigns retain the power to prosecute separately a defendant for commission of the same criminal acts. *Bartkus v. Illinois,* 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959); *Abbate v. United States,* 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959). More importantly, defendant concedes that no technical double jeopardy problem exists here, in that different items of merchandise were involved in the State and federal prosecutions. Rather, he alleges a "sub rosa agreement" between local and federal prosecutors to split the prosecution for the "aggrandizement" of the federal prosecutors' conviction statistics. Defendant's Omnibus Motion at 5. In the absence of any evidence of such an agreement in the record before us, we reject such a suggestion out of hand.

### IV

Accordingly, defendant's motions for suppression of evidence and for dismissal of the indictment must be, and the same hereby are, denied in all respects.

So ordered.

---

5. It should be noted at this point that our finding of the sufficiency of the warrant and the underlying affidavit suggests an alternative ground for the admissibility of the evidence gained pursuant to the earlier consent searches, see part II, A., at 8–10 *supra*. Given the chronological proximity of the consent searches and the issuance of the warrant, it is apparent that the fruits of the consent searches would have been discovered ultimately anyway, as an "inevitable discovery" flowing from the execution of the warrant. *See United States v. Galante,* 547 F.2d 733 (2d Cir. 1976), *cert. denied,* 431 U.S. 969, 97 S.Ct. 2930, 53 L.Ed.2d 1066 (1977); *United States v. Cole,* 463 F.2d 163 (2d Cir.), *cert. denied,* 409 U.S. 942, 93 S.Ct. 238, 34 L.Ed.2d 193 (1972). *See generally*

*Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

Our finding on this point should put to rest any argument by defendant that the fruits of the consent searches would not have been found but for the tip from the N.Y.P.D. about the loading of the coffee onto the truck in front of the Clifton Place warehouse. At the time, when the N.Y.P.D. alerted the F.B.I. agents to the fact that the defendant's truck was being loaded, the F.B.I. was already on its way to obtain a search warrant from the United States Magistrates. Under the aforesaid doctrine it is clear that the stolen merchandise would have been discovered regardless of such information from the N.Y.P.D.