**UNITED STATES of America, Plaintiff,**

**v.**

**Rudolph Marques TORRES, Ernesto Lopez Salsedo, Richard Steven Montes, Jose Luis Buenrostro, Defendants.**

**No. Crim. S–79–123.**

United States District Court, E. D. California.

Nov. 19, 1980.

---

Herman Sillas, U. S. Atty. by Julian Macias, Asst. U. S. Atty., Sacramento, Cal., for the Government.

Steven Bauer, Sacramento, Cal., for defendant Torres.

Robert E. Hodge, Sacramento, Cal., for defendant Buenrostro.

E. Richard Walker, Federal Public Defender by Robert Holley, Deputy Public Defender, Sacramento, Cal., for defendant Montes.

Jerome S. Stanley, and Christopher H. Wing, Sacramento, Cal., for defendant Salsedo.

## OPINION AND ORDER

KARLTON, District Judge.

### I

### BACKGROUND

This is the second opinion written by me relative to the defendants' efforts to suppress certain evidence obtained by law enforcement in connection with defendants'

alleged violations of 18 U.S.C. §§ 471, 472 (Counterfeiting). Initially the hearing on the motion to suppress was interrupted when I ordered that certain surveillance logs kept by Secret Service agents in connection with their investigation, be delivered to the defendants so that they could meaningfully cross-examine the Government witness. At the time of the order, the Government believed it had no duty to deliver the logs and desired appellate review. To facilitate that review I suppressed all of the evidence. *United States v. Salsedo*, 477 F.Supp. 1235 (E.D.Cal.1979).

During the course of the appeal the Government's position shifted. At oral argument the Government apparently stipulated to delivery of the logs for Court review to determine whether they constituted information helpful to the defendants' cross-examination. Given that stipulation, the Court of Appeals determined that the appeal was moot and remanded the matter to this Court. *United States v. Torres*, 622 F.2d 465 (9th Cir. 1980).

Upon remand the logs were then delivered to me. I determined that they contained relevant evidence and ordered them delivered to the defendants. Thereafter the evidentiary hearing was resumed and I am now able to reach the issue of the propriety of the seizure of the evidence in question.[1]

## II

### HEARSAY EVIDENCE IN SUPPRESSION HEARINGS

■ The Government presented but one witness at the suppression hearing, Agent Hamilton, the agent in charge of the investigation. Through Agent Hamilton, but over objection, I received both hearsay, and hearsay on hearsay. In *United States v. Salsedo, supra*, I wrestled with the difficult problems arising out of the fact that the Federal Rules of Evidence are not applicable to suppression hearings (*see also United States v. Smith*, 87 F.R.D. 693, (E.D.Cal. 1980)). Since, as I observed there, the non-applicability of those rules could not mean that no rules applied, I determined that "in the absence of definitive guidance, it is this Court's intention to apply the common law of evidence interpreted 'in the light of reason and experience' [citations omitted]." *United States v. Salsedo*, 477 F.Supp. at 1240. I further observed that "this creates no problem in the admissibility of hearsay since as I note in several places in the opinion, a suppression hearing deals with what the Government knew, whatever its source. In effect, in a 'probable cause' hearing the hearsay evidence is admitted not for its truth, but for the purpose of establishing what was known. The Court must then weigh the knowledge in light of its reliability to determine if a reasonable officer would believe a crime had been committed and defendant was the culprit." *Id.* at n.8. Defendants argue, however, that in evaluating the reasonableness of the assessments of the Government's witness, there must be some limit to the kinds of hearsay that a reasonable officer could rely on, and thus some limits to what this Court should admit for purpose of testing the reasonableness of the officer's belief. The common law of evidence interpreted "in light of reason and experience" suggests, however, that the rulings on objections to hearsay in a suppression hearing are not issues of admissibility since hearsay in this context is a matter of the weight to be given such evidence.

---

1. I note in passing that defendants' possession of the logs immeasurably aided in the conduct of the suppression hearing. The defendants, having possession of the logs, were able to focus on the incidents that were meaningful to the suppression hearing and were not forced to cross-examine in the dark. Moreover, since they possessed the logs, defendants were not required to use the hearing as a disguised discovery procedure. The result was that the hearing was limited to matters clearly material to the issues presented, was significantly more efficient than it otherwise would have been, and in sum many hours were saved. This observation is prompted by the hope that the Government will itself see the value of reasonable discovery and, continuing along the course it adopted in the Court of Appeals, voluntarily deliver relevant documents in its possession.

In *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), the Court addressed the same issue. In *Matlock* the defendant's cohabitant had consented to the search of a bedroom she shared with the defendant. The defendant moved to suppress the evidence seized pursuant to her consent, arguing she was without power to consent. The Government relied on her description of her relationship given to the investigating officers at the time of the search to prove both her consent and her right to consent. The Supreme Court observed that two issues were presented; one, whether or not the law enforcement officer's belief that she could give consent was reasonable and, two, as an objective fact was she able to provide consent?[2]

■ The Court first observed that as to the officer's subjective belief, hearsay was clearly admissible. This appears to be for the same reasons I found such evidence admissible in the first *Salsedo* decision. The second question, however, raises somewhat different problems. Ordinarily, of course, hearsay is simply not admissible for the purpose of proving a fact in issue (i. e., did the person giving consent in fact have authority to do so) as contrasted with the officer's state of mind. Nonetheless, the Court held that strict rules of hearsay need not be applied to preliminary questions of fact such as the admissibility of seized evidence. The Court's rationale for relaxing hearsay standards was based upon the ability of judges to appreciate that hearsay evidence may not be entitled to the same weight as other evidence. The Court first

observed that the hearsay rule arose in the context of jury trials and was premised on the fear that a jury would not be able to properly assess the weight which should be given to hearsay. This problem, the Court felt, would not extend to judges. *See United States v. Matlock, supra* at 175, 94 S.Ct. at 995. Accordingly, the Court held that the trial court's exclusion of the hearsay evidence relating to the ability of the defendant's female companion to give consent was improper. Nonetheless, the trial court was not ordered to admit the seized evidence. On the contrary, the matter was remanded to the district court so that "the district court first reconsider the sufficiency of the evidence in the light of this decision and opinion." *Id.* at 177–78, 94 S.Ct. at 996. Inasmuch as the rule excluding hearsay is bottomed on the inability of a jury to properly evaluate the weight to be accorded hearsay, and given the fact that upon remand the district court was ordered to determine the sufficiency of the evidence, it appears that the proper role of hearsay in suppression hearings may be reasonably inferred. In a suppression hearing evidence is not to be excluded solely because it is hearsay. The hearsay nature of evidence goes to the weight to be accorded it rather than the admissibility of the evidence. Nonetheless it appears relatively clear that hearsay, because it does not permit of meaningful cross examination ("the greatest legal engine ever invented for the discovery of truth," 5 J. Wigmore, Evidence § 1367 (3d ed. 1940)), it cannot be given the full weight that percipient testimony is accorded.[3]

---

**2.** The Court did not need to reach and thus did not resolve the issue of whether reasonable belief on the part of the officers alone without actual authority would suffice. *United States v. Matlock*, 415 U.S. 164, 177 n.14, 94 S.Ct. 988, 996 n.14, 39 L.Ed.2d 242 (1974).

**3.** The defendants have not raised, and thus I do not reach, the separate question of whether or not the admissibility of hearsay at the suppression hearing raises confrontation clause questions. *See McCray v. Illinois*, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967). In *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970), the court sanctioned the

admission into evidence at trial of testimony elicited at the preliminary hearing. The Court held that since the testimony in question had been obtained under oath and had been subject to cross–examination, it bore sufficient indicia of reliability to permit its introduction and thus overcame confrontation clause objections. It has been observed, however, that "although hearsay rules and the confrontation clause may protect similar values, the admissibility of a statement under a hearsay exception does not normally establish compliance with the confrontation clause." *United States v. Fielding*, 630 F.2d 1357 (9th Cir. 1980). *See also Dutton v. Evans*, 400 U.S. 74, 86, 91 S.Ct. 210, 218, 27

Given the *Matlock* standards, I am now prepared to make the following findings. These findings of fact are based upon either the percipient witness testimony of Agent Hamilton or hearsay which for the purposes of this case I find admissible for probable cause determinations, or reliable. I do not, because I cannot, make a determination of declarant unavailability.[4]

## III

## FINDINGS OF FACT

The local Secret Service maintains a relationship with those businesses that sell anything connected with printing. They request that they be informed of any customer seeking "high rag content" paper. Such paper is required for quality counterfeiting.

On June 15, 1979, a certain Mr. Diehop, the manager of the A. B. Dick Company in Stockton, California, informed Agent Hamilton of certain activities connected with defendant Rudolph Torres. He related that up until January of 1979, Torres had been in the printing business and A. B. Dick was one of his suppliers. Among the items sold to Torres was an A. B. Dick 360 printing press. Diehop reported that he had not seen Torres for approximately six months. On June 7, Torres and defendant Montes came into the store. Torres stated that he was helping a friend set up a print shop in Stockton. Torres purchased off–set printing plates and the supplies necessary to develop those plates. Diehop then related that on the 14th, Torres, Montes and a female returned to the A. B. Dick Company. At that time Torres borrowed a light table which was returned shortly thereafter. Torres signed a receipt using an address of 1433 S. Stanislaus, Stockton. On the same day he purchased various inks, the colors of which were appropriate to counterfeiting.

By virtue of this tip the Secret Service began an investigation.

Over the next few days they learned that Torres had also sought parchment finish off–white high rag content paper from several other suppliers. Several days later on June 19, the Secret Service contacted the J. C. Paper Store and learned that they had sold Torres film negatives, chemicals to develop film and white ink. That day Marilyn Bradshore (who had previously been identified as connected with Torres) had sought high rag content paper. She asserted that the paper was needed to print stationery for a new attorney in town. On the same day agents followed Torres to San Jose, a city several hours away from Stockton. While there Torres visited a paper supplier. After he departed an agent entered the shop identifying himself. The shop clerk said "I know why you are here." The agent asked "what did that guy want" (referring to Torres). The salesman pulled out a $20 bill and said "that's what he wanted. He wanted that kind of paper but he didn't know how to ask for it."

On June 21st Montes purchased white opaque ink from the A. B. Dick Store. When the white ink was purchased the sales person asked for an address, but Montes refused to provide one. White opaque ink may be used to "half–tone" paper. The result of halftoning white bond paper is to make counterfeit bills made therefrom appear more like genuine currency.

On the same day Torres and Montes returned to the A. B. Dick Store making inquiries about purchasing a numerical printing attachment for an A. B. Dick 360 press. Torres also purchased gothic numerals which were similar in style to the numerals that appear as serial numbers on

L.Ed.2d 213 (1970) and *Ohio v. Roberts,* —— U.S. ——, —— – ——, 100 S.Ct. 2531, 2538– 39, 65 L.Ed.2d 597 (1980). Moreover, it appears that the admissibility of hearsay *at trial* is dependent upon the non–availability of the declarant, *Ohio v. Roberts, supra,* and requires the trial court to make an "on the record" determination of non–availability and reliability. *United States v. Fielding, supra.* Whether such standards are appropriate in a suppression hearing, has not been raised here and is thus not addressed.

4. Nonetheless I am forced to observe, given the limited weight to be accorded hearsay, both the Government and defendants proceed in suppression hearings by way of substantial hearsay at their peril.

United States currency. According to Agent Hamilton, an experienced investigator of counterfeiting violations, the attachment Torres sought is useful in making sophisticated bills.

Pursuant to its investigation, the Secret Service learned that Torres had rented a car. Upon consent from the auto renting agency, agents of the Secret Service searched the trunk of the car and found a box marked as having contained high rag content paper and ten ream wrappers. A ream consists of 500 sheets.

On June 28, A. B. Dick received a service call from Torres for the 1433 S. Stanislaus address. When the servicemen arrived they were shown to the garage. At the garage they found an A. B. Dick 360 printing press. In the garage they also saw an escort copy camera and various printing supplies. The supplies included products used to develop plates and photographic supplies. On the press the servicemen also observed a half-tone screen which was being used with white opaque ink on white bond paper. These facts were reported to Hamilton. It is Agent Hamilton's experience that normally counterfeiters locate the necessary printing equipment "somewhere other than a print shop—maybe a garage or shed or trailer somewhere...." The 1433 S. Stanislaus address was identified as belonging to defendant Buenrostro.

On the morning of July 2, agents surveilling Torres' apartment saw him leave with Buenrostro. At about 3:30, agents surveilling the Stanislaus address saw Buenrostro leave and return with what appeared to them to be take-out lunches. The agents at the Stanislaus address had not seen Torres. Although they could not be sure, it appeared to the agents that Buenrostro took the lunches into the garage. A four direction surveillance was then ordered for the Stanislaus residence. At about 9:30 that evening an agent walked down the alley adjacent to the garage. When he reached the garage he smelled the odor of printer's ink and saw three male Mexicans standing in the yard. He did not hear the presses. He thought one of the three males could be Torres by virtue of his size. It was Agent Hamilton's calculation that given the ten ream wrappers found, and given the capacity of the machine, a run of all of the paper Torres had could be completed in one day. By virtue of his experience, Hamilton feared that after the run had been completed, the defendants would dispose of the plates. He thus ordered that he be immediately notified if anyone left the premises with a package.

At about 9:55 three males came around the North side of the house. They engaged in a short conversation. One of the persons had a package in his hand. Although the area was dark, Agent Parker, who was observing them, thought that two of the subjects were Torres and Buenrostro. The three men entered a car and left. Agent Hamilton, having had all of the information noted above conveyed to him one way or another, ordered a stop of the vehicle. An arrest followed. A paper bag was found on the console between the driver and passenger. It was opened and contained incriminating evidence. Fifteen minutes later, after being Mirandized, Buenrostro was questioned by Hamilton. Buenrostro denied any knowledge of counterfeiting activities. After being told that he need not do so, Buenrostro signed a consent to search the premises and various automobiles. During the interrogation, Buenrostro asserted that he had rented the garage to Torres. Nonetheless, when asked if the garage was locked he acknowledged that it was and when asked for a key, supplied one. A search of the house and garage produced further incriminating evidence. A further search of a vehicle produced incriminating evidence against defendant Salsedo.

The defendants seek suppression of all of the evidence on various grounds.[5] They

---

**5.** The motion for an evidentiary hearing was granted in 1979, when *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), was the law. The Government moved for reconsideration of the order granting the evidentiary hearing in light of *United States v. Salvucci*, —— U.S. ——, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980) and *Rawlings v. Kentucky*,

assert that because all of the activities of defendants are as consistent with innocent as guilty conduct, the agents were without reasonable and probable cause to arrest the defendants, and accordingly the search of the paper bag was improper. They then argue that Buenrostro's consent to the search, being the fruit of an illegal arrest and search (*Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)) should in turn be suppressed. Finally, they assert that Buenrostro's consent to search was limited to the house and automobiles, and thus did not extend to the garage. They also argue that even if Buenrostro's consent did extend to the garage, he had no authority to so consent.

## IV

### PROBABLE CAUSE

■ Under the Fourth Amendment "an arresting officer may, without a warrant, search a person validly arrested . . . the fact of a lawful arrest, standing alone, authorizes a search." *Michigan v. DeFillippo* (1979) 443 U.S. 31, 35, 99 S.Ct. 2627, 2631, 61 L.Ed.2d 343. "If the arrest was validly made, the search was valid. . . ." *Id.* at 36, 99 S.Ct. at 2631. An officer may arrest without a warrant if there is probable cause to believe that the suspect has committed or is committing an offense. *Adams v. Williams*, 407 U.S. 143, 148–49, 92 S.Ct. 1921, 1924, 32 L.Ed.2d 612 (1972).

■ Thus we must first attend to the issue of probable cause. The Supreme Court ". . . repeatedly has explained that 'probable cause' to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo, supra* 443 U.S. at 37, 99 S.Ct. at 2632. The issue here, however, is narrower. Here the question

—— U.S. ——, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980). Because of the timing of the motion to reconsider, the Court deferred a ruling pending a completion of the evidentiary hearing. Now,

presented is the appropriate standard to be applied when the circumstances known to the arresting officer may be reasonably perceived as being as consistent with innocence as with guilt. In this Circuit where the defendant's conduct is ambiguous, it is necessary that the Government demonstrate that ". . . a prudent person could say that an innocent course of conduct was substantially less likely than a criminal one." *United States v. Patacchia*, 602 F.2d 218, 220 (9th Cir. 1979); *United States v. Patterson*, 492 F.2d 995, 997 (9th Cir. 1974), *cert. denied* 419 U.S. 846, 95 S.Ct. 82, 42 L.Ed.2d 75 (1974).

■ This is indeed a close case under the applicable standards. There is no question that the conduct of the defendants raised strong suspicions of criminal conduct. Nonetheless, the evidence was susceptible of innocent explanation. Upon evaluation, I find that the facts are sufficient to rise to the level of probable cause. While it may be true that purchasing high rag content paper, half-toning it, purchasing the appropriate inks, buying the appropriate gothic numerals, seeking the numerical attachment and using a garage are not necessarily unlawful, taken together under all the circumstances they represent evidence which produces more than strong suspicion. The facts accumulate to probable cause. Accordingly, I find that the arrest was appropriate and therefore a search of the person in connection therewith would be equally lawful.

## V

### THE SEARCH OF THE PAPER BAG AND THE CONSENT SEARCHES

■ As I have just noted, a search of the persons of the defendants in connection with the arrest is wholly justified. Here however, the agents reached across the defendants while they were in the car and subsequent to their arrest to open a paper

in light of the Court's resolution of the matter on the merits, I need not consider the matter of standing.

bag sitting on a console between the driver and a passenger. Although *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970) recognized that automobiles stopped on the highway present a distinct subspecies of Fourth Amendment problems, the fact that the paper bag was rolled closed is suggestive that despite *Chambers* a search of the bag was improper. *See e. g. Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979). Nonetheless, this precise question has recently been disposed of adverse to the defendants by the Ninth Circuit. *United States v. Mackey*, 626 F.2d 684 (1980). Although I am persuaded by the dissent, I am bound by the majority and accordingly find that the search of the paper bag was lawful.

Inasmuch as it cannot be seriously disputed that but for the assertion of wrongful arrest, the consent to search was freely and voluntarily given (*See Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)), I find no impediment to the search of the home. Thus, the only question remaining is whether the consent extended to the garage and, if so, whether Buenrostro had authority to give that consent. The written form signed by the defendant consented to "a complete search of the premises and/or the automobiles at 1433 S. Stanislaus Street, Stockton, California." Defendants argue that the word "premises" cannot be read to include a detached garage (*see* LaFave, *Search and Seizure* § 8.1, p. 624 for a discussion of the problem presented and the diverse resolution of the problem in various state courts). I note in passing that Webster's Third International Dictionary defines the word "premises" as follows: "A specified piece or tract of land with the structures on it." Thus it appears that the word "premises" (if viewed as a language matter) covered the garage. However, candor requires a more simple explanation. At the time Buenrostro gave consent he was under arrest and knew that the agents had searched the bag and found incriminating evidence. In essence the game was up. Buenrostro's consent to the search of his home (which he knew also contained incriminating evidence) could only have been motivated by his sense that standing on his right to require a search warrant would avail him nothing. Whatever was going through his mind, it is clear to me that fine distinctions between the home and garage (much less "premises" and garage) were simply not on his mind. The defendant was giving a general consent to search. I have no doubt that had the officers included the word "garage" he would have signed a similar consent form. I wish to be clear, I am not suggesting that it makes no difference what a defendant consents to, I am finding that in this case and under these facts the defendant was in fact consenting to a search of the garage when he consented to a search of the premises.

The final question is whether or not Buenrostro had the authority to give consent. *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) is dispositive. *Matlock* holds that when the prosecution seeks to justify a warrantless search by proof of a voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority or another sufficient relationship to the premises or effects sought to be inspected. The authority which justifies a third party consent, *Matlock* teaches, rests on mutual use of the property by persons generally having joint access or control for most purposes. *United States v. Matlock, supra* 169–71, 94 S.Ct. 992–93. The evidence bearing on Buenrostro's ability to give consent may be quickly summarized. First, the garage in question was on his property. Second, when the repairmen came to Buenrostro's home they were admitted to the garage "by a man who called himself Jose." Jose is Buenrostro's first name. Third, there is evidence from which I may infer Buenrostro was in the garage in question on the day the counterfeiting was being done. Fourth, although he claimed he had rented the garage to Torres, he knew the garage was locked. Finally, he had a key to the garage.

Taken together these facts are sufficient to raise the reasonable inference that Buenrostro had access to come and go as he pleased and, under *Matlock* standards, he had the right to provide access to others. At the hearing neither Buenrostro nor Torres testified to the contrary. While the Government has the burden of proof when relying on consent, *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968), the standard is merely by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. at 177, n. 14, 94 S.Ct. at 996, n. 14; *United States v. Marshall*, 488 F.2d 1169, 1186 (9th Cir. 1973); *United States v. O'Looney*, 544 F.2d 385, 388 (9th Cir. 1976), *cert. denied*, 429 U.S. 1023, 97 S.Ct. 642, 50 L.Ed.2d 625 (1976); *United States v. Fernandez*, 456 F.2d 638, 640 (2nd Cir. 1972); *United States v. Block*, 590 F.2d 535, 539 (4th Cir. 1978); *United States v. Adames*, 485 F.Supp. 965, 969 (E.D.N.Y.1980); *but see Channel v. United States*, 285 F.2d 217, 218–220 (9th Cir. 1960) (clear and positive evidence); *State of Montana v. Tomich*, 332 F.2d 987, 989 (9th Cir. 1964) (clear and positive evidence); *Sherrick v. Eyman*, 389 F.2d 648, 651 (9th Cir. 1968) (clear and positive evidence); *United States v. Bracer*, 342 F.2d 522 (2nd Cir. 1965), *cert. denied*, 382 U.S. 954, 86 S.Ct. 427, 15 L.Ed.2d 359 (1965); *United States v. Mapp*, 476 F.2d 67, 77 (2nd Cir. 1973) (clear and convincing evidence). Here again I wish to be clear, had Buenrostro in fact rented the garage to Torres his status as a landlord would be insufficient to provide him with authority to give consent whether or not he had a key. *See e. g. Chapman v. United States*, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961); *Stoner v. California*, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964). The question is whether Buenrostro had joint use of the garage with Torres. The evidence, under the applicable standard and in the absence of contrary evidence, is sufficient to establish joint use. Accordingly, I find under the applicable standard of persuasion that Buenrostro had the authority to consent.

## ORDER

1. The defendants' motion to suppress the evidence is denied;

2. This matter is now set for trial on December 2, 1980, at 10:00 a. m. Trial confirmation is now scheduled for Tuesday, November 25, 1980, at 8:30 a. m.