THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
LUCY JAKUBOWSKI, Appellant.

Fourth Department, March 6, 1984

APPEARANCES OF COUNSEL

*J. Richardson Lippert, II,* for appellant.

*Levant M. Himelein, III, District Attorney (Eugene C. Lynch* of counsel), for respondent.

OPINION OF THE COURT

HANCOCK, JR., J.

It is well settled under the Fourth and Fourteenth Amendments that "a search conducted without a warrant issued upon probable cause is *'per se* unreasonable * * * subject only to a few specifically established and well-delineated exceptions.' *Katz* v. *United States,* 389 U.S. 347, 357" (*Schneckloth v Bustamonte,* 412 US 218, 219 [STEWART, J.]); that "one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent" (*Schneckloth v Bustamonte, supra,* p 219); and that "[w]hen a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntar-

ily given" (footnote omitted) (*Bumper v North Carolina,* 391 US 543, 548 [STEWART, J.]).

Defendant's sole argument in this appeal from her conviction on a guilty plea to criminal possession of a weapon, fourth degree, is that the court erred in denying her motion to suppress the weapon seized by police during a warrantless search of her home after obtaining a written consent. We disagree. Without making formal findings the court denied the motion following a hearing at which the significant facts pertaining to the search were related by defendant and David O'Brien, a criminal investigator with the New York State Police who conducted the search. A summary follows.

O'Brien testified that he had arrested one Jerry O'Neal in connection with the burglary of a summer camp owned by Thomas Loveric. O'Neal, on May 11, 1981, gave a signed statement implicating defendant and admitting that he and defendant had committed the burglary on February 20, 1981 and had taken a tractor, a wood stove, a refrigerator, and other large items plus "some small stuff". O'Brien, accompanied by another member of the State Police, went to see defendant at her residence, but she was not there. In the driveway, however, attached to a lawnmower believed to have been taken in the burglary, O'Brien found a handwritten note from defendant. In it defendant, who knew she had been implicated in the burglary, explained that someone had brought the mower to her home but that she did not know its origin. The note ended with an invitation to the police "to come and chitchat."

On June 19, 1981, when they returned to defendant's home, the two officers met defendant and after giving her *Miranda* warnings obtained a written waiver of her *Miranda* rights and a written consent to search the premises reading as follows:

"I, Lucy Jakubowski, having been informed of my constitutional right not to have a search made of the premises hereinafter mentioned without a search warrant and of my right to refuse to consent to such a search, hereby authorize Investigator D. M. O'Brien and Trooper R. J. O'Brien, members of the New York State Police, to conduct a complete search of my premises located at Rt. 16, Franklinville.

"These members of the New York State Police are authorized by me to take from my premises any letters, papers, materials or other property which they may desire.

"This written permission is being given by me to the above-named members of the New York State Police voluntarily and without threats or promises of any kind.

"Signed Lucy Jakubowski."

The two officers signed as witnesses.

Before defendant signed the consent form, O'Brien testified, he told her he was looking for property taken in the Loveric burglary and that he believed (although he was "not positive") that he showed her a complete list of the property reported stolen which consisted of seven pages covering more than 230 different articles including a kitchen range, a tractor, a stove, and other large units in addition to sundry items such as screwdrivers, toggle switches, a flashlight, extension cords, a crocheted doily, bedding and various types of outer wear. He may have shown her another list as well.

In the search of defendant's bedroom, O'Brien found marihuana on top of the dresser next to the bed and an Ivers Johnson .22 caliber revolver and ammunition in the top dresser drawer. When he found them, defendant was not with him, he said, but elsewhere in the house. On cross-examination O'Brien stated that defendant had expressed a desire to be present during the search but that he had searched the bathroom and a couple of rooms without her. The house, it appears, was small and, except for the basement, on one level.

Defendant testified that before she signed the consent form she sat with the officers at her dining room table "for the longest time talking" and drinking coffee. She asked Investigator O'Brien what he was looking for. In response he showed her a one-page (not a seven-page) list of the items and, after looking at it, she consented to the search of her house. The only objects on this list that she could recall were a tractor, a refrigerator, a chain saw and wood-burning stoves — "the huge items that were on the list." Concerning the consent form, she testified:

"Q: Now, could you tell The Court briefly what your understanding of this consent was? In other words, what you were consenting to?

"A: My understanding was that he was searching for the items on the list.

"Q: Such as?

"A: Gravley tractor, woodburning stoves, refrigerator. A cook stove."

And further:

"Q: Did you understand that they would be going through your dresser drawers?

"A: No. I didn't think a Gravley tractor would fit in a dresser drawer. Any of the items that I was shown."

As the officers were about to commence their search, some women arrived whom defendant accompanied to her basement where she was holding a "garage" sale. Defendant's description as to what transpired thereafter is: "I asked him [i.e., Investigator O'Brien] not to go through the house until I came back * * *. They [i.e., the women] were down there chitchatting the longest time and finally they left and when I was down in the basement, I could hear [the officers] walking around upstairs so they had already proceeded to search the house without me up there and I specified I wanted to be there." Investigator O'Brien had already discovered the weapon and the marihuana when defendant returned from the basement. There is no evidence that defendant, upon learning that O'Brien had searched the dresser, revoked her consent, ordered the search to cease, or made any protest about the nature of the search.

There is no contention that the conduct of the officers was in any way overbearing and no testimony that defendant did not read or understand what was printed on the consent form. Defendant had had prior contacts with the police and had been questioned several times before.

Whether a consent to search was voluntarily given presents a question of fact to be determined from the totality of the circumstances (see *Schneckloth v Bustamonte,* 412 US 218, 227, *supra; People v Gonzalez,* 39 NY2d 122, 128), and the People's burden on this issue is a heavy one (see

*People v Gonzalez, supra,* p 128; *People v Driscoll,* 87 AD2d 996, 997). Among the factors to be considered are whether the accused was in custody at the time the consent was given (see, e.g., *People v Gonzalez, supra,* p 128; *People v Jackson,* 77 AD2d 630, 631); whether he knew he could refuse to consent (see *Schneckloth v Bustamonte, supra,* pp 227, 229-233); whether the police employed threats or other coercive techniques (see, e.g., *Bumper v North Carolina,* 391 US 543, *supra; People v Brown,* 77 AD2d 537); whether the accused was accustomed to dealing with the police (see, e.g., *United States v Watson,* 423 US 411, 424-425; *People v Gonzalez, supra,* p 129); and whether he had been, prior to giving the consent, evasive or uncooperative with the police (see, e.g., *People v Gonzalez, supra,* p 129). Under these authorities, the evidence here compels the conclusion that defendant knowingly and voluntarily signed the consent form. Indeed, defendant on appeal does not claim otherwise.

The real question is whether, assuming that defendant's consent was freely given, the police in conducting the search went beyond the consent. The scope of the search, it is held, must be limited strictly to the terms of the consent (see *Walter v United States,* 447 US 649, 656-657; *United States v Taibe,* 446 F Supp 1142, 1147, affd 591 F2d 1333 [CCA2d], cert den 444 US 1071; 2 LaFave, Search and Seizure, § 8.1, subd [c]); and defendant argues that her consent, notwithstanding the broad wording of the written form, was limited to a search for the large objects she recalled seeing on the one-page list. Searches have been held invalid where the police have exceeded the consent which was limited to a search for a particular purpose or of a particular place or container (see, e.g., *United States v Dichiarinte,* 445 F2d 126 [CCA7th]; *United States v Taibe, supra*); or where, after the defendant has revoked his oral consent, the police continued the search (see *United States v Dichiarinte, supra*). While most cases concerning limitations on the scope of a search involve oral consents, there is no reason why limiting conditions may not also be imposed where the consent is written (see *United States v Covello,* 657 F2d 151 [CCA7th]). When the consent is in written form, the wording of the form, while not conclusive, must

be considered in the totality of the circumstances on the question of the scope of the search and "[i]nterpretation of the * * * consent form is crucial to the case" (*United States v Covello, supra,* p 154). Thus, in *United States v Torres* (663 F2d 1019 [CCA10th], cert den 456 US 973), the court upheld a search of an auto including the removal of portions of the interior door panel based on a written consent to a "complete" search of the auto. And in *United States v Covello (supra,* p 153), where the signed consent was to a " 'complete search of [the defendant's] automobile' ", the court reversed the lower court's determination that as a matter of law the consent did not authorize the search of suitcases found within the trunk and remanded for an examination of the totality of the circumstances, noting that the consent appeared to encompass everything within the automobile.

In analyzing the "totality of circumstances" here, we note first that the consent form, like that in *United States v Covello (supra)* is for "a complete search of [the] premises" and specifically authorizes the police to "take from [the] premises any letters, papers, materials or other property which they may desire." Defendant's description of her conduct in inviting the police to "come and chitchat" and talking with them over coffee for "the longest time" belies any suggestion that the ambience of her meeting with the police was not congenial and unhurried. There is no claim of police pressure or deception, and, significantly, defendant does not assert that she was unaware of or misunderstood what she was signing. Her testimony is, rather, that notwithstanding the breadth of the consent form, she assumed that the police were searching for large objects and that they would not look in her dresser. She does not say that the police were made aware of this assumption or that she attached any oral conditions to her consent. Under these circumstances, in view of defendant's posture of friendly co-operation, the police could reasonably have believed that she had no objection to a total search as authorized in the form. Significantly, there was no protest on her part when she discovered that O'Brien, contrary to her professed expectations, had searched her dresser drawer in her absence. We find, based on the totality of the

circumstances, that the People have met their burden of proving that defendant voluntarily consented to a "complete search of [the] premises" as defined in the consent form. Defendant's unspoken assumption that the search would be limited because the police were searching only for large items did not limit the scope of the "complete search" to which she had consented (see, generally, *United States v Torres,* 663 F2d 1019, *supra; United States v Torres,* 504 F Supp 864, affd 659 F2d 1012 [CCA9th], cert den 455 US 926; *People v Shelton,* 110 Ill App 3d 625; *State v Koucoules,* 343 A2d 860 [Me]; *State v Austin,* 91 NM 793; 2 LaFave, Search and Seizure, § 8.1, subd [c]; see, also, *Gentile v United States,* 493 F2d 1404 [CCA5th], cert den 419 US 979).

We see no merit to the argument that the officers exceeded the scope of the consent by searching when defendant was not present, i.e., when she was in the basement. When she signed the consent to a complete search, she imposed no such limitation, and the request upon going downstairs that they "not * * * go through the house until [she] came back" alone is insufficient to impose a limitation on or constitute a revocation of the consent. We hold that the police search of defendant's premises was in all respects reasonable (see *Schneckloth v Bustamonte,* 412 US 218, *supra*).

This court has reviewed the evidence and made the factual findings contained in the foregoing opinion pursuant to CPL 470.15 (subd 1) (see *People v Acosta,* 74 AD2d 640; *People v Russo,* 45 AD2d 1040). The judgment should be affirmed.

Doerr, O'Donnell, Moule and Schnepp, JJ., concur.

Judgment unanimously affirmed.