UNITED STATES of America, Plaintiff,

v.

Brian E. DONNELLY, Defendant.

Crim. No. 95–10007–NG.

United States District Court,
D. Massachusetts.

April 20, 1995.

Bjorn Lange, Owen S. Walker, Federal Defender Office, Boston, MA, for defendant.

Ben T. Clements, U.S. Atty.'s Office, Boston, MA, for U.S.

## MEMORANDUM AND DECISION

GERTNER, District Judge.

### I. INTRODUCTION

On April 25, 1994, at approximately 2:30 p.m., the defendant, Brian E. Donnelly, was arrested for possession of stolen property, namely certain radios which, the evidence suggests, Donnelly had in fact been authorized to possess. Shortly after the arrest, and before the error could be discovered, the Whitman police conducted an inventory search of Donnelly's van, discovering a gun and ammunition in the glove compartment. Donnelly was then charged with being a fel-

on in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g).

Donnelly moves to suppress the gun and ammunition. Two days of hearings were held; several briefs were submitted covering a number of issues. Based on that evidence and those submissions, I **GRANT** the defendant's motion to suppress.

## II. *FINDINGS OF FACT*

On April 25, 1994, at 1:00 p.m. Sergeant Raymond Lirosi ("Lirosi"), was assigned to investigate an incident involving stolen radios. He went to Plymouth County Communications, Inc., on Hancock Street in Whitman, Massachusetts, and spoke to John Swartz ("Swartz"), one of the owners. In addition, he spoke on the phone with Stanley Fogg ("Fogg"), the owner of the radios and the alleged victim of the thefts. Lirosi testified on behalf of the Government; Fogg on behalf of the defendant. Also testifying for the defendant was Michael McCabe, an employee of Plymouth County Communications who overheard Lirosi's conversations with Swartz, his side of other phone conversations, and who observed the defendant's arrest and the events following it.

1. Swartz did not testify. Lirosi recounted what Swartz had found out. Moreover, McCabe also testified as to Swartz' side of the Swartz–Fogg telephone conversation. *See United States v. Torres,* 504 F.Supp. 864 (E.D.Cal.1980) (Federal Rules of Evidence, including the rules with respect to hearsay, do not apply to a suppression hearing.)

2. Fogg said he did not hear the name "Brian" at all. If he had, he would not have reported the radios stolen since Donnelly was authorized to sell them. McCabe said that Swartz mentioned the name John Joaquin and someone named "Brian."

3. Lirosi testified:

Q. And did he [Fogg] indicate when and what alerted him to the fact that these had been stolen?

A. He said he reported them—in *earlier* this month.

Q. That would be April 1994.

A. April, right.

Q. And did he say how he first learned that they were stolen?

Lirosi testified that Swartz informed him that two men, one named "Brian" and a second, John Joaquin, had come into the store trying to either sell, or have the frequencies changed, on some two way radios. Swartz indicated that after the two gentlemen left, he "ran a check" on the serial numbers of the radios, discovering that the radios belonged to a Stanley Fogg in Pembroke, Massachusetts.[1] Although Swartz did not know it at the time, Stanley Fogg was the father-in-law of the defendant Brian Donnelly. After speaking with Fogg, Swartz called the Whitman police department reporting the results of his inquiries.[2]

Lirosi testified that he then called Fogg and the Pembroke Police Department (the department in the town in which Fogg's home was located.) Fogg confirmed that certain radios were missing and had apparently been stolen. The Pembroke police, according to Lirosi, corroborated the Fogg report. Lirosi testified that Pembroke informed him that a police report had been made "earlier in [the] month," and indeed, that the Pembroke police had "investigated" the matter.[3] In fact, the Pembroke report had been made on the same day and through the same misunderstandings as had the Whitman report.[4]

A. He had gone to Florida for the winter *and returned sometime in April and discovered them missing.*

Later he noted that he specifically called the Pembroke Police Department to "confirm":

Q. Who did you speak to at the Pembroke Police Department?

A. It was the dispatcher.

Q. And what did you say and what did the dispatcher say?

A. I asked the dispatcher if he could verify the fact that *Pembroke Police had investigated* and filed a breaking and entering on the property from Mr. Fogg.

Q. What was the response?

A. *That they had.*

Q. The Pembroke Police confirmed a report of stolen property from Mr. Fogg?

A. Yes.

(Emphasis supplied.)
This is obviously an overstatement. The Pembroke report was generated after Swartz had called Fogg inquiring about the radios. See n. 4 **infra.**

4. The Pembroke report was generated on April 25, 1994 at 12:40 p.m. after Swartz called Fogg

At some point, "Brian" called back and Swartz alerted Lirosi. Swartz was instructed to encourage "Brian" to return for the radios. While he was waiting, Lirosi was to pretend to be a customer in the store. A uniformed Whitman police officer, Officer O'Rourke, was called for back-up. O'Rourke hid in the rear of the store.

Lirosi claimed that he observed Donnelly's van pull up to the door and park in front of the store. He reported that he saw a person later identified as Brian Donnelly coming out of the van and entering the store. At that point, Officer O'Rourke came from the back room and Lirosi approached Donnelly from the other side. At this point, Donnelly reported that he got the radios from his father-in-law, but never mentioned his father-in-law's name. Lirosi reported that Donnelly never asked the police to check on the story and call his father-in-law.

After Donnelly was placed in a cruiser, Lirosi testified that he called for the dog officer[5] and a wrecker. The car was impounded, and during the "routine inventory" a gun was discovered.[6]

Although Lirosi testified that the written inventory policy obliged him to impound the car when the driver was arrested, in fact, the written policy suggests, and Lirosi conceded, that he had considerable discretion, that impounding did not automatically follow any arrest. *See,* section IIIB, *infra.*

Lirosi's testimony is contradicted in a number of respects by both Stanley Fogg, Michael McCabe, and to some degree, by the written record. Fogg testified that as a result of Swartz' call, he checked to see if the radios were in their usual place. It was then and only then that he found that these radios were missing, along with some other items, and reported that to Swartz. After the

Swartz call, Fogg contacted the Pembroke Police Department. The Pembroke police report was generated after the Swartz call that very morning; there was no formal police report of stolen property predating that call and no investigation to speak of.[7]

Fogg also testified that Swartz did not mention Brian Donnelly's name to him as the person having custody of the radios. Given the fact that "Brian's" last name was not known to store personnel, and that the only full name the store personnel knew was John Joaquin, who was a customer of the store, it is entirely likely that Swartz only mentioned Joaquin's name to Fogg, or emphasized that name rather than "Brian's". Fogg indicated that had he been informed that his son-in-law Brian was involved, he would have told them immediately that Brian had his permission to sell the radios. Fogg, a retired developer living most of the time in Florida, had entrusted his home and certain business equipment, including the two way radios he had owned for his business, to his son in law to be sold.[8]

McCabe was an employee of Plymouth County Communications for six years. His testimony was striking because it came at some risk to his livelihood. The Whitman police were a major customer of the store. Plymouth serviced their two-way radios and other electronic equipment. McCabe did not know the defendant at all. Moreover, since the apprehension and arrest of a customer was obviously an unusual event in this small store, it is reasonable to believe that McCabe paid considerable attention to it.

McCabe's testimony suggested that the information Lirosi received from the Pembroke police hardly corroborated the report of theft. He testified that Lirosi "asked them if they had a report on stolen radios from a Stanley Fogg out of an address in Pem-

inquiring about the radios. Lirosi was on the case by 1:30 p.m. There was no prior Pembroke investigation and, unless the Pembroke police are lightening quick with paperwork, no meaningful report of a breaking and entering.

5. Lirosi testified that a dog was present in Donnelly's van.

6. Lirosi also testified that he met Fogg at the police station shortly after Donnelly's arrest and

that Fogg never said that Donnelly was authorized to sell the radios. Fogg has no memory of meeting with the police at the police station. He was quite emphatic that had anyone asked him he would have said that Brian had permission to possess and dispose of the radios.

7. *See,* n. 4, *supra.*

8. See n. 6, *supra.*

broke." He then overheard Lirosi saying, "Well you're going to get a report on it and when you do get the report on it, would you please keep a copy of it for me. I'll be over to get it."

In addition, McCabe testified that, given Lirosi's location within the store, there was no way that Lirosi could have observed Donnelly's car as he drove to the store. Lirosi was sitting in the back corner in the waiting area reading a newspaper, and likely could not see the front door because there was a large Coke machine obstructing his view. McCabe reported that Lirosi did not move until Swartz signalled him as Donnelly walked in the door. He also reported that as Donnelly left, Donnelly said, "Why don't you call my father-in-law," and that "this was a misunderstanding."

Perhaps the most significant part of McCabe's testimony concerned his observations of Lirosi illegally searching Donnelly's van, without probable cause, without a warrant and before it had been inventoried.

After Donnelly's arrest, McCabe watched as the dog officer came to retrieve the dog in Donnelly's van. After the dog officer came and went, McCabe reported that Lirosi opened up the passenger side of the van, looked around, apparently went into the glove compartment (where the gun was ultimately found), and then walked to the back of the van, taking down the license plate number. Lirosi returned to the store and said "I got a funny feeling when [they] search the van or when they inventory the van ... they're going to find a gun." Then and only then did he call for a truck to tow the van.

I credit McCabe's testimony on this subject in the light of his demeanor, his lack of bias, and other apparent inconsistencies and exaggerations in Lirosi's testimony. I find that Lirosi searched Donnelly's van and found a gun in the glove compartment before the car was towed and inventoried.

Finally, it is undisputed that the van was in the front of the store, where the customers generally park, that it was not blocking traffic, that the street was not a main artery, in a high crime area. Moreover, although the car was pointed in the wrong direction, McCabe reported that "a million and one cars always park up along the side," just as Donnelly did.

At the police department, after the arrest, Lirosi called in Donnelly's automobile registration, and discovered that the plate had been revoked and assigned to another motor vehicle.

## III. CONCLUSIONS OF LAW

### A. The Arrest

█ Donnelly challenges his arrest, claiming that there was no probable cause to arrest him at 2:00 p.m. on April 25, 1994. He suggests that Lirosi should have called his father in law when Donnelly reported he had authority to sell the radios from that source.

I disagree. I find that the underpinnings for Lirosi's probable cause were adequately found in his conversations with Swartz and Fogg. He had reason to believe that the radios were stolen in a break at the Fogg home, and that the defendant had them. While I do not regard the call to Pembroke Police as corroboration, it was not necessary to the legal sufficiency of this arrest. Based on a miscommunication or not, the arrest passes constitutional muster. Given the information Lirosi had at the time, he had no obligation to inquire further. *See, Criss v. City of Kent,* 867 F.2d 259, 263 (6th Cir. 1988); *Marx v. Gumbinner,* 905 F.2d 1503, 1507 n. 6 (11th Cir.1990); *Krause v. Bennett,* 887 F.2d 362, 372 (2d Cir.1989); *Baker v. McCollan,* 443 U.S. 137, 145–146, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979).

### B. The Inventory Search

█ When a criminal defendant moves to suppress evidence seized without a warrant, the government bears the burden of proving that the warrantless seizure falls within one of the narrow exceptions to the warrant requirement. *United States v. Carbajal,* 956 F.2d 924, 930 (9th Cir.1992) (holding burden is on the government to show reasonableness of warrantless search including demonstrating that search comes within one of the narrow exceptions to warrant requirement.)

■ Inventory searches qualify as one such exception. The United States Supreme Court has permitted such searches, eschewing warrants and even probable cause, whenever the government's conduct was undertaken to accomplish certain defined administrative purposes, like a "community care-taking function" and when the search is governed by fixed standards. *See Cady v. Dombrowski,* 413 U.S. 433, 441, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706 (1973).

■ In *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), for instance, police officers ticketed defendant's automobile for overtime parking, towed the car to an impound lot, and inventoried the contents, including the unlocked glove compartment in which marijuana was discovered. The Court upheld the reasonableness of the inventory search because "the standard of probable cause is peculiarly related to criminal investigations not routine, non-criminal procedures." 428 U.S. at 370 n. 5, 96 S.Ct. at 3097 n. 5. The Court then evaluated the legality of the search by balancing the intrusion on the individual's constitutionally protected interests against the non criminal caretaking purpose of the state, finding the latter to be substantial. Presumably, if the only government purpose in *Opperman* had been the discovery of evidence of criminal activity, the balance, and the outcome would have been different.[9]

Likewise, to insure that the officers do not exceed the permissible scope of the state's non-criminal interests, the Court has found that there must be standardized procedures defining when inventory searches are to be conducted and their scope. *Florida v. Wells,* 495 U.S. 1, 4, 110 S.Ct. 1632, 1635, 109 L.Ed.2d 1 (1990).[10]

■ Both are necessary: A search that fails to follow the standard procedures is invalid, as is a search whose purposes fall outside the limited inventory search exception. *Colorado v. Bertine,* 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987). In *Bertine* for example, the Court upheld municipal regulations of Boulder, Colorado that gave its police officers the discretion to chose between impounding a car or parking and locking it in a public place "so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." *Bertine,* 479 U.S. at 375, 107 S.Ct. at 743.

I find that the search at issue here fails on both accounts: that the policy gives the officer discretion to impound or not to impound without standardized criteria framing the exercise of that discretion, and further, that the officer exercised that discretion solely to search for evidence of a crime. Lirosi had illegally searched the van at an earlier point in time and well knew that he would find a

9. The officer's purpose is critical. The police may not conduct an inventory search if acting in bad faith or if it is done solely for an investigatory purpose. *U.S. v. Marshall,* 986 F.2d 1171, 1175 (8th Cir.1993) (inventory search of vehicle invalid when the officer indicated that the purpose of the search was to find evidence of criminal activity); *U.S. v. Johnson,* 820 F.2d 1065, 1072 (9th Cir.1987) (inventory search of sealed envelope in which officers previously placed currency found on the defendant at the time of arrest invalid because motivation for search was to determine if currency came from series of bank robberies); *U.S. v. Khoury,* 901 F.2d 948, 957–959 (11th Cir.1990) (inventory search exception did not justify a second look at inventoried diary when motivated by investigatory purpose). *Compare Colorado v. Bertine,* 479 U.S. 367, 372, 107 S.Ct. 738, 741, 93 L.Ed.2d 739 (1987) (inventory search not invalid when no showing that the government acted in bad faith or searched for the sole purpose of investigation); *U.S. v. Arango–Correa,* 851 F.2d 54, 59 (2d Cir.1988)

(same); *U.S. v. Young,* 825 F.2d 60, 61 (5th Cir.1987) *cert. denied,* 485 U.S. 1012, 108 S.Ct. 1483, 99 L.Ed.2d 711 (1988) (inventory search of car about to be impounded before discovery of lawful owner's identity and location, found to be invalid when no showing of pretext); *U.S. v. Belt,* 854 F.2d 1054, 1055–56 (7th Cir.1988) (inventory search of car impounded and evidence of aggravated assault not invalid when no showing that the charge, increased from simple to aggravated assault, was merely a ploy for search).

10. See, *United States v. Salmon,* 944 F.2d 1106 (3d Cir.1991); *United States v. Hahn,* 922 F.2d 243 (5th Cir.1991) (purpose of Wells rule is "to minimize (or virtually eliminate) the discretion of the officers in determining whether or not to open" containers). See, e.g., *Commonwealth v. Bishop,* 402 Mass. 449, 523 N.E.2d 779 (1988) (state constitution requires the exclusion of evidence seized during an inventory search not conducted pursuant to standard police procedures.)

gun in the glove compartment if it were inventoried.

### 1. *Absence of Standard Procedures*

■ The government maintains that the van was towed to the Whitman Police station garage pursuant to its standard procedure. According to Lirosi, when a person who has been operating a motor vehicle is arrested by Whitman police, the motor vehicle must be towed to the police station. The policy notes:

> Whenever, because of incarceration, incapacity or the unavailability of the operator/owner of a motor vehicle, officers of the Whitman Police Department cause same to be towed, they shall assume a responsibility for safeguarding the contents of the vehicle for the operator/owner.

Lirosi interprets that policy to mean that "if we put anybody under arrest," we must tow the vehicle.[11] That is not what the policy says. It notes that *when* the vehicle has been towed because of those reasons, "incarceration, incapacity or unavailability of operator/owner," *then* there shall be an inventory. It does not state that the police officer is remiss if he fails to tow it.[12] It is a policy dealing with what is to occur once a vehicle is impounded, and how the inventory is conducted, not the circumstances under which it should be impounded.

The only exception to impounding that Lirosi initially noted is the situation in which a licensed driver is available and the defendant authorizes that person to take the car away. In fact, however, there were other exceptions which Lirosi conceded in his testimony, for instance if the car were in a private parking lot, or if someone were arrested for disorderly conduct, or criminal trespass. Under those circumstances the officer would not ask "Where's your vehicle?" and once the car was pointed out, impound it. Indeed, according to Lirosi, arrests occur in a number of circumstances without being accompanied by the mandatory impounding of the vehicle.

■ Thus, Lirosi agreed that the arresting officer had to "make a judgment call at the time of the arrest as to whether or not there is going to be a tow." The kinds of factors the officer would consider would be "whether or not I saw him get out of [the car] or if he volunteered 'that's my car.'" In that situation, citing to no specific standard other than the general policy, Lirosi claimed that he would "probably" and "for safekeeping" tow the car. Unlike *United States v. Ramos–Morales*, 981 F.2d 625 (1st Cir.1992) or *Bertine* the Whitman policy has no meaningful "standard procedures" defining when a car must be impounded.[13]

■ Lirosi's characterization of the procedures he follows seems to make the impounding contingent on the kind of crime for which the person is arrested, rather than hinging that decision on the safety of the car (i.e. the problem of abandoned cars), or the safety of the public (i.e. the problem of obstructing streets). That is precisely the wrong approach. The care taking function, unlike the criminal investigatory function, has nothing to do with the crime for which the person was arrested. And even his typology of situations for which impounding is required leaves considerable discretion to the

---

11. He also claims that the Whitman written policy requires them to conduct an inventory search of any vehicle including closed containers or compartments in it. In the glove compartment, the only area Lirosi claimed he searched as distinguished from other officers, he found a .25 caliber Colt semi-automatic pistol.

12. To be sure, the point at which there is no discretion is after impounding. The policy suggests that if the car is towed, that then it must be inventoried. The officer has no discretion once the vehicle is in his custody.

13. It is not sufficient that the inventory is of the kind usually taken by police departments, *United*

*States v. Hellman*, 556 F.2d 442, 444 (9th Cir. 1977), or that it conformed to that officer's standard practice, *People v. Long*, 419 Mich. 636, 359 N.W.2d 194 (1984). In *Long* the court noted: "Although the officer testified as to his personal 'standard' procedure, this procedure does not meet the requirements of reasonableness as suggested in *Opperman*. A standard departmental practice gives some assurance that the particular vehicle or part of the vehicle was not singled out for a search based upon an improper motive. Without a departmental policy, too much discretion is placed in the hands of a police officer. His decision to search may be an arbitrary one." 419 Mich. at 647, 359 N.W.2d 194.

officer without any meaningful standards.[14] In contrast, in *Bertine*, "the discretion afforded the Boulder police was exercised in light of standardized criteria, related to the feasibility and appropriateness of parking and locking a vehicle rather than impounding it," and "[t]here was no showing that the police chose to impound Bertine's van in order to investigate suspected criminal activity." *Bertine*, 479 U.S. at 375–376, 107 S.Ct. at 743 (footnote omitted). As one commentator noted: [15]

> "A regime that has very specific rules governing when an impounded vehicle may be inventoried but permits officers substantial discretion concerning whether to impound in the first place [as here] is just as threatening to fourth amendment values as a regime that carefully circumscribes the impoundment decision but leaves the police broad latitude regarding which impounded cars will be inventoried."

*LaFave, supra* at 459.

■ In any case, even according to Lirosi's criteria, this van did not have to be impounded. I find that Lirosi initially did not see the van as McCabe testified, and thus he would not have connected the van with the offense at all. It was not blocking traffic. It was not in a main artery. It was parked in the wrong direction, but even that was a regular practice of the store's customers and not noteworthy. On this record, there is no reason to believe that but for the subsequent illegal search, Lirosi would have inventoried this van at all.

### 2. *Investigatory Purpose*

The government claims that in fact it does not matter if Lirosi had an investigatory purpose for the inventory search so long as there was an appropriate non-criminal rationale for it. If an officer had a right to inventory a car in the first instance, it is irrelevant if he also has suspicions about evidence of crime.[16] This is an approach that seeks to minimize the second guessing of officers when the objective analysis suggests that they had a right to impound, regardless of their mixed motives.

■ In the instant case, however, I disagree with the predicate of the government's position. Whether impounding the vehicle was appropriate in the first instance under the law depended upon whether there was a standard policy purporting to mandate it and whether that policy was lawful. Here, no policy mandated towing. There was no objective criteria requiring it.

■ Likewise, I find that there was no mixed motive. There was no "caretaking" rationale at all on these facts. The officer's motive was not to protect Donnelly's property, or the public. It was to "uncover" the gun he had already seen.

---

**14.** The fact that the Whitman police have discretion to decide when to impound a vehicle is not the problem. A rule of the breadth of Lirosi's initial characterization—tow any car whenever the occupant has been incapacitated by arrest, no matter where the car was, no matter whether it was blocking traffic—would limit discretion completely but would sweep too broadly, extending this inventory search far beyond its permissible boundaries. *See United States v. Ramos-Morales*, 981 F.2d 625 (Bownes, J., dissenting). As the Court made clear in *Bertine*, it is only "reasonable" police regulations which satisfied the fourth amendment.

A rule that leaves it completely to the judgment of the officer—as Lirosi's testimony suggests—runs the risk that officers who have arrested someone, who have no basis to search a car but think it might be helpful, or who have been investigating an individual, might impound as a ruse to conduct a criminal search.

The issue, both as a matter of constitutional law and policy, is to structure ways to control discretion. *See*, LaFave, *Controlling Discretion by Administrative Regulations: The Use, Misuses, and Nonuse of Police Rules and Policies in Fourth Amendment Adjudication*, 89 Mich.L.Rev. 442 (Dec. 1990).

**15.** The harm here is not only the harm that the police will undertake to impound cars as a ruse to search them for evidence of criminal activity. It is that the police will be arbitrary, impounding my car when others are left on the street, etc. Standard procedures guard against differential treatment for whatever the motivation. *LaFave, supra* at 459.

**16.** See *U.S. v. Rodriguez–Morales*, 929 F.2d 780, 787 (1st Cir.1991) (inventory search not invalid when caretaking motive is not mere subterfuge for search for cocaine.) *See also, U.S. v. Gallo*, 927 F.2d 815, 819 (5th Cir.1991) (finding inventory search by local police officer valid when allowed by standard procedures in addition to motive to discover evidence of crime.)

**308**

Finally, the government suggests that towing the vehicle was inevitable, and likewise inevitable, the discovery of the gun. By 2:54 p.m. the Whitman police knew that the vehicle was not registered. Since it was parked in the wrong direction, on the westerly side of the street facing north, it was inevitable, they claim, that it would be tagged, especially given its unregistered status.

 The inevitable discovery doctrine, articulated in *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) postulates a hypothetical independent source of the information taken from an illegal search, which if proven, would break the chain of causation between the illegal search and the evidence. Here, the government claims that the illegal parking of the Donnelly van, coupled with its registration problems would have led inevitably to its towing and impounding. That is not at all clear on this record.

Lirosi took down the plate number after he had illegally searched the van. There was no testimony on what circumstances, following an arrest, that he would have "run the plates" if the car had been brought to his attention.

Nor was there any testimony making inevitable the towing of the car simply because of a traffic violation. The most Lirosi would say is that the car would have been tagged and "sometimes" would be towed. *Nix v. Williams* requires more. In effect, towing was no more an inevitable result of any traffic violation involving Donnelly's van, than impounding was an inevitable consequence of any arrest. Finally, there is every reason to believe, given Fogg's testimony, that the underlying mistake triggering Donnelly's arrest would have been remedied before the car was towed.

An inevitable discovery test based—as here—on pure speculation would run the risk of entirely swallowing the exclusionary rule.

## IV. *CONCLUSION*

For all the above reasons, I **GRANT** Defendant's Motion to Suppress.